PACIFIC SOUND PRODUCTION LIMITED PARTNERSHIP, a.k.a. PACIFIC SOUND LIMITED PARTNERSHIP, GERALD B. HENNING, TAX MATTERS PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Pacific Sound Prod. Ltd. Partnership v. Commissioner
Docket Nos. 20537-87, 2976-88, 3027-88, 3028-88, 3029-88, 20877-89, 20878-89
United States Tax Court
T.C. Memo 1993-253; 1993 Tax Ct. Memo LEXIS 256; 65 T.C.M. (CCH) 2898; June 8, 1993, Filed *256 For petitioners: Darrell D. Hallett, Larry N. Johnson, and Jeannette A. Cyphers.
For respondent: Wendy S. Pearson, Blake W. Ferguson, and Peter R. Hockman. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: Respondent, by notices of final partnership administrative adjustments (FPAA), and by subsequent amendments to answer, determined adjustments to petitioners' partnership returns for the years 1982, 1983, and 1984 as follows: Pacific Sound Production Limited Partnership, Docket No. 20537-87
Year Description of Adjustment
Amount
1982 Ordinary loss disallowed
$ 5,094     Investment tax credit qualifying
property reduction 2,305,600 1983 Ordinary loss disallowed
376,964 Investment tax credit qualifying
property reduction 311,200 Audio Advertising Limited Partnership, Docket No. 2976-88
Year Description of Adjustment
Amount
1983 Legal expenses disallowed
$ 4,924     Lease expense disallowed
1,013 At risk basis reduction
163,100 Investment tax credit qualifying
property reduction 1,524,683 Adjustments Raised in Amended Answer
Amount
Lease expense
$ 1,013     License fee
246,429 Amortization
492 Promotion/seminar expense
372 Bank charges
98 Legal fees
4,924 $ 253,328   Adjustment per original FPAA
5,937 Increase of adjustments for 1983
$ 247,391  Other adjustments for 1983:
a. Investment tax credit basis:
As reported   $ 1,597,679 Adjustment per original FPAA   1,524,683 Adjustment increase   $ 72,996    b. At risk basis limitation to
partners:    As reported   $ 253,328   Adjustment per original FPAA   163,100 Adjustment increase   $ 90,228    Year Description of Adjustment
Amount
1984 Management fees disallowed
$ 9,300     At risk basis reduction
218,462 Adjustments Raised in Amended Answer
Amount
Legal expense
$ 438       Lease expense
369,643 Interest expense
24,643 Travel expense
856 Amortization
657 Bank charges
31 Accounting expense
1,015 Insurance expense
1,498 Promotion/seminar expense
441 Distribution expense
10,945 Office expense
345 Management fees
9,300 $ 419,812   Adjustment per original FPAA
9,300 Increase of adjustments for 1984
$ 410,512   Other adjustments for 1984:
a. Basis limitation to partners:
As reported   $ 415,734   Adjustment per original FPAA   218,462 Adjustment increase   $ 197,272   Assured Communications Limited Partnership, Docket No. 3027-88
Year Description of Adjustment
Amount
1984 Commission expense disallowed
$ 31,500    Legal fees disallowed
12,756 License expense disallowed
89,750 Basis reduction
355,313 Investment tax credit qualifying
property reduction 2,065,521 Adjustments Raised in Amended Answer
Amount
Accrued lease payments
$ 495,000   License fees
89,750 Distribution fees
32,807 Legal/professional fees
12,756 $ 630,313   Adjustment per original FPAA
134,006 Increase of adjustments for 1984
$ 496,307   Other adjustments for 1984:
a. Investment tax credit basis:
As reported   $ 2,161,111 Adjustment per original FPAA   2,065,521 Adjustment increase   $ 95,590    b. Basis limitation to partners:
As reported   $ 630,313   Adjustment per original FPAA   355,313 Adjustment increase   $ 275,000   Advanced Communications Limited Partnership, Docket No. 3028-88
Year Description of Adjustment
Amount
1983 Legal fees disallowed
$ 1,200     Lease expense disallowed
809 Basis limitation
14,359 Investment tax credit qualifying
property reduction 1,243,781 Adjustments Raised in Amended Answer
Amount
Lease expense
$ 809       License expense
24,614 Amortization
13 Legal fees
1,200 $ 26,636    Adjustment per original FPAA
2,009 Increase of adjustments for 1983
$ 24,627    Other adjustments for 1983:
a. Investment tax credit basis:
As reported   $ 1,276,620 Adjustment per original FPAA   1,243,781 Adjustment increase   $ 32,839    b. Basis limitation to partners:
As reported   $ 26,636    Adjustment per original FPAA   14,359 Adjustment increase   $ 12,277    Year Description of Adjustment
Amount
1984 Management fees disallowed
$ 9,415     Legal expenses disallowed
5,693 Basis limitation
188,025 Adjustments Raised in Amended Answer
Amount
Legal fees
$ 5,693     Lease expense
295,362 Interest expense
20,252 Travel expense
830 Amortization
983 Bank charges
44 Accounting expense
768 Distribution expense
10,187 Office expense
1,900 Management fees
9,415 $ 345,434   Adjustment per original FPAA
15,108 Increase of adjustments for 1984
$ 330,326   Other adjustments for 1984:
a. Basis limitation to partners:
As reported   $ 338,618   Adjustment per original FPAA   188,025 Adjustment increase   $ 150,593   Masterwork Productions Leasing Limited Partnership, Docket No. 3029-88
Year Description of Adjustment
Amount
1983 Depreciation expense disallowed
$ 154,501   Rental expense disallowed
49,981 Adjustments Raised in Amended Answer
Amount
Lease placement fees
$ 23,331    Appraisal fees
1,450 Travel expense
266 Recording expense
238 Supplies & office expense
95 Consulting fee
599 Professional fees
25,200 Depreciation - Jingles
8,164 Depreciation - Master Recording
147,116 $ 206,459   Adjustment per original FPAA
204,482 Increase of adjustments for 1983
$ 1,977     1984 Depreciation expense disallowed
$ 386,760   Rental expense disallowed
(includes professional fees, lease placement fees, management fees, legal fees, appraisal fees) 169,119 Adjustments Raised in Amended Answer
Amount
Professional fees
$ 9,026     Lease placement fees
71,893 Appraisal fees
1,200 Travel expense
269 Legal fees
38,500 Accounting expense
1,463 Marketing expense
1,000 Printing expense
147 License expense
70 Recording expense
180 Management fees
48,500 Depreciation - Jingles
392,769 Depreciation - Master Recording
5,500 $ 570,517   Adjustment per original FPAA
558,879 Increase of adjustments for 1984
$ 11,638    Station I.D. Limited Partnership, Docket No. 20877-89
Year Description of Adjustment
Amount
1982 Legal expense disallowed
$ 5,280     Lease expense disallowed
1,594 Investment tax credit qualifying
property reduction 2,464,000 1983 Income reduced
(10,928)    Legal expense disallowed
325 Lease expense disallowed
581,812 Promotion expense disallowed
24,854 Other expenses disallowed
6,737 United Communications Limited Partnership, Docket No. 20878-89
Year Description of Adjustment
Amount
1983 Legal expense disallowed
$ 409       License expense disallowed
29,267 Investment tax credit qualifying
property reduction 656,562 1984 Income reduced
(211)       Legal and accounting expense
disallowed 5,814 Lease expense disallowed
149,143 Promotion expense disallowed
3,414 Other expenses disallowed
441 Theft loss disallowed
35,068 Interest expense disallowed
12,677 *257 Petitioners all were located in the State of Washington when the petitions were filed. Six of the seven partnerships involved in these cases are lessees of certain items of commercial music, termed generally "jingles" or "ID's". "Jingles" are short musical recordings which supply a background for broadcast commercial advertising. "ID's" (sometimes called "audio ID's" or "station ID's") are more sophisticated versions of jingles. They consist of 6 to 10 or more arrangements of commercial music used in a coordinated fashion to identify, and present an image of, a broadcasting station. The lessors of these items were two other partnerships, Masterwork Productions Leasing Limited Partnership -- which is the remaining partnership involved in this case -- and Cameo Productions Leasing Limited Partnership. These consolidated cases concern the Federal income tax consequences of transactions involving those leased items. The partnerships involved in this litigation are not the only partnerships which bought or leased jingles and ID's identified herein, nor are the jingles and ID's they bought and sold the only jingles and ID's that were produced, sold, and leased at the same time. *258 Those other situations, however, are not now before us. The use in this opinion of terminology concerning partnerships and the transactions in which they allegedly participated is not to be construed as a finding that such entities were or were not created or that the transactions are or are not valid for Federal income tax purposes. Such terminology is used only for convenience. The issues presented for decision are: (1) Whether the transactions at issue lack effect for tax purposes because they are devoid of business purposes and lack economic substance; (2) whether the partners in the limited partnerships were "at risk" within the meaning of section 465 for purposes of claiming losses and credits arising from the transactions at issue; (3) whether the jingles and ID's qualify for investment tax credit treatment; (4) whether petitioners' accrual of lease and other business expenses should be disallowed because they were contingent and unascertainable expenses; (5) whether petitioners' reported miscellaneous business expenses and syndication and organizational expenses are properly deductible; (6) whether petitioner Masterwork Productions Leasing Limited Partnership claimed a *259 proper cost basis for determining depreciation expense; and (7) whether the lease expenses, management fees, professional fees, and other miscellaneous expenses constitute ordinary and necessary business expenses. For convenience, the outline of our findings and opinion is set forth below. FINDINGS OF FACT Some of the facts have been stipulated and are so found. I. Origin and Nature of the Transaction
A. Petitioner Limited Partnerships
Petitioners Pacific Sound Production Limited Partnership (Pacific), Masterwork Productions Leasing Limited Partnership (Masterwork), and Station I.D. Limited Partnership (Station I.D.) are limited partnerships established in the State of Washington in 1982. Petitioners Audio Advertising Limited Partnership (Audio), Advanced Communications Limited Partnership (Advanced), and United Communications Limited Partnership (United) are limited partnerships, formed in the State of Washington in 1983. Petitioner Assured Communications Limited Partnership (Assured) is a limited partnership formed in the State of Idaho in 1984. All of the lessee partnerships involved in this case -- that is, all of the above partnerships except for the lessor *260 partnership Masterwork -- report their income on an accrual basis. The lessor partnership Masterwork reports its income on a cash basis. B. Michael O'Murphy and Dan Miller and Their Background in Tax-Oriented Investments
In 1981, Seattle attorney Michael O'Murphy (O'Murphy) associated himself with Dan Miller (Miller), who sold insurance and securities. O'Murphy and Miller jointly promoted tax shelters involving leases of master sound recordings. A "master sound recording" is a tape or other sound conveyance upon which a specific performance or program has been recorded electronically for use in the production of commercial audio products, such as records, tapes, and compact discs. O'Murphy and Miller structured their tax shelters as sales of limited partnership units in partnerships that leased the master sound recordings. The limited partners who purchased these units would then claim tax credits and deductions generated by the master sound recording transaction on their tax returns. Typically, O'Murphy and Miller would establish a venture by creating a "purchasing" partnership to purchase one or more master sound recordings at a modest price. This partnership would, *261 in turn, lease the master sound recordings to one or more lessee limited partnerships. O'Murphy established a "purchasing" limited partnership named Cameo Productions Leasing Limited Partnership (Cameo) which participated in the purchase and leasing of six master sound recordings. Typically, O'Murphy and Miller would charge Cameo $ 40,000 for a master sound recording; they received $ 10,000 in cash and the remainder in notes. They set the price at $ 40,000 to yield an income tax deduction ratio of $ 4 in deductions for every $ 1 invested. Once the price had been set, O'Murphy and Miller obtained appraisals to support the price charged. The resulting tax benefits -- in the form of investment credits and deductions -- were then passed through to the lessee partnerships, and ultimately to the investing limited partners. By 1982 or 1983, O'Murphy knew that the master recordings were in his words, "practically dodo birds"; they had the propensity "not to produce any revenue". Although ostensibly set up as profit-making enterprises, none of the master recording shelters established by O'Murphy and Miller generated a profit for the investors aside from tax advantages. C. Dwight *262 Egan and Dennis Crockett and Their Background in Music and Recording
In 1982, Dwight Egan (Egan), Dennis Crockett (Crockett), and Merrill Osmond organized a Utah corporation, Radio Broadcast International, Inc. (RABI) to produce and sell radio programs to radio networks in the United States. Egan was a musician who had become associated with the Osmond family, an internationally-known family of singers and entertainers. During the course of his association with the Osmonds, Egan became responsible for hiring the musicians involved in Osmond family productions, arranging the music for their productions, and serving as coordinator for music on their television shows. Crockett also was associated with the Osmonds. He was a singer, arranger, and musician for the family, and he conducted the Osmond band when they went on tour. Merrill Osmond was a singer and a member of the Osmond family. Egan and Crockett had been involved in the production of some commercials made by the Osmonds, including a "Hawaiian Punch" commercial, which played on national television. They were also involved in the composition and production of commercial "jingles" -- short musical compositions that could *263 be played or broadcast as commercial advertisements. Osmond family interests formed a company called First Choice, which, with the participation of Egan and Crockett, produced approximately 150 jingles. These jingles were marketed for "barter time". "Barter time" is a broadcasting company's commercial air time which it exchanges for goods or services, such as the right to use a jingle library. The jingle producer can then resell the barter time. The value of "barter time" is deeply discounted from its cash value; a "barter" is normally anywhere from 2 to 1 to over 10 to 1 on the dollar. Between 1979 and 1983, the First Choice library had been sold to more than 100 stations; it earned $ 1.4 million in "barter time". In early 1983, Egan and Crockett thought there might be a continuing market for libraries of advertising jingles. They believed that such libraries could be marketed to radio and television stations and also might be utilized for retail in-store advertising. Later that year, Jim Devaney, who was a cousin of one of Miller's partners, told Miller that the Osmond Studio was in need of capital. Miller arranged a meeting in Utah with Egan and Crockett in August of *264 1982. O'Murphy joined them on the second day of the meetings to discuss a deal. D. The Transaction Among Michael O'Murphy, Dan Miller, Dwight Egan, and Dennis Crockett
The initial proposal by Egan and Crockett to O'Murphy and Miller involved the sale of the 150-jingle "First Choice" library. Egan's proposal was that the library was for sale only in toto at a price of $ 289,000. The proposal required an additional $ 39,000 to add updated station ID's in the form of three discs. The offering letter, which O'Murphy assisted Egan in preparing, also provided that, if the libraries were leased to an investing leasing partnership, approximately 50 percent of gross receipts would pay the "difference between the cash and fair market value". Part of the purchase price was to be payable by a note due in 12 years. O'Murphy and Miller decided not to purchase the First Choice library because some of the material in that library already had been used. The possibility of prior use raised questions regarding title to the jingles and also indicated that those jingles would not qualify for an investment tax credit that could be passed through to the investing limited partners. After rejecting *265 the First Choice library, O'Murphy and Miller made arrangements with Egan and Crockett for production and purchase of the jingles and ID's which became the subject of this case. Beginning in 1982 and continuing into 1983, Egan and Crockett wrote and produced the jingles and ID's that are involved here. They formed a company called BP, Inc., for this purpose. [3]
Once the parties had agreed to the underlying deal, O'Murphy established the terms of all the implementing purchase, lease, and distribution agreements, as well as promissory notes relating to the jingles and ID's. O'Murphy also wrote the private placement memoranda and the draft individual investor agreements concerning the lessee limited partnerships. Both the lessor *266 and lessee partnerships relied exclusively on O'Murphy to draft the agreements relating to the jingles and ID's. O'Murphy established the partnerships' terms and agreements and amendments thereto. The partnerships were structured in the same two-tiered manner that O'Murphy had employed for the earlier master sound recording deals in order to obtain tax benefits for the partners. Assuring investors that they would recover their investments in the form of tax savings was O'Murphy's and Miller's way of guaranteeing that there was no downside risk in investments. II. The Structuring of the Lessor Partnerships
O'Murphy arranged to establish Cameo and Masterwork as lessor partnerships. At the time of the transactions at issue, both Cameo and Masterwork were composed of one individual general partner, one corporate general partner, and two limited partners. A. Masterwork Productions Leasing Limited Partnership
O'Murphy persuaded Charles Whiteley (Whiteley) to become the individual general partner of Masterwork, and to be president and sole shareholder of Masterwork Leasing, Ltd. the corporate general partner. Whiteley made no cash investment in the corporate general partner. *267 At the time of trial, Whiteley stated that his net worth was several million dollars. O'Murphy estimated Whiteley's net worth at more than $ 1 million, but down from an earlier net worth of $ 3 million. Whiteley agreed to become a general partner because in return for Whiteley's serving as general partner of Masterwork O'Murphy agreed to forgive some debts that Whiteley owed to O'Murphy for legal services. Whiteley felt an obligation to O'Murphy, who had lost substantial amounts of money in investments with him. Also, Whiteley had no experience in the advertising, radio, grocery, or ID business. At the time he agreed to have Masterwork purchase the jingles, he had seen no pro forma projections of income from those jingles. Although he had employed several certified public accountants and attorneys, other than O'Murphy, he did not discuss the jingle transaction with any of them before entering the jingle venture. One of Masterwork's two limited partners was Dan Miller's wholly-owned corporation, M&R Marketing. It received a limited partnership interest in Masterwork in lieu of a "finders' fee" for Miller's efforts in establishing the jingles and ID venture with Egan and Crockett. *268 The second limited partner was the Gawain Foundation (Gawain). O'Murphy had established Gawain and assigned to it the limited partnership interest that he himself would have received for setting up the venture. Gawain received its limited partnership interest solely on the basis of its contribution of $ 680,000 in notes and O'Murphy's representation that Gawain "can handle it". Gawain's only asset, however, was the limited partnership interest in Masterwork. O'Murphy anticipated that Gawain would donate its share of the partnership income to the Esoterian Society, an organization with which he was affiliated. Masterwork paid Gawain about $ 57,000 in partnership distributions as a result of Gawain's limited partnership interest. The Masterwork partnership agreement provided that Gawain and M&R Marketing would share approximately half the profits up to $ 59,700; thereafter Gawain would take 90 percent of the profits. The general partner Whiteley would then take 1 percent of the profits and the corporate general partner, Masterwork Leasing, Ltd., would take 9 percent. B. Cameo Productions Leasing Limited Partnership
The individual general partner of the Cameo lessor partnership *269 was Sondra Dahl (Dahl), who O'Murphy had known from meetings of the Esoterian Society. The corporate general partner of Cameo was Cameo Productions, Inc.; Dahl was its president and sole shareholder. Before investing, Dahl had discussed the venture a few times with O'Murphy and Egan. At that time, she had assets in excess of liabilities totaling no more than $ 60,000, some of which were protected from creditors by the Washington State homestead exemption. Dahl had difficulty in meeting expenses and obligations from her salary as a supervisor in a subsidiary of the Boeing Corporation. Her corporation, Cameo Productions, Inc., was capitalized with a $ 5,000 note and no cash. She did not review any appraisals of the subject jingles before committing Cameo to purchase them. M&R Marketing received one of the two limited partnership interests in Cameo, in lieu of receiving a cash finders' fee for Miller's efforts in establishing the ID ventures. O'Murphy also established the "Arthurian Foundation" (Arthurian), arranged for it to be the second limited partner of Cameo, and assigned to it his interest in the net proceeds of the jingle-ID venture. The Cameo agreement was later amended *270 to permit separate profit interests for Dan Miller as well as his M&R Corporation. The Cameo partnership agreement provided, like those of Masterwork, in general, for Dahl to receive 1/10 of 1 percent of the profits, while her corporation, Cameo Productions, Inc., (Cameo) received 9/10 of 1 percent of the profits, until such time as Arthurian and Dan Miller had recovered $ 26,325 apiece. After that time Dahl and her corporation would share 10 percent of the profits. Miller and Arthurian each then would receive a 45-percent share of the profits until he and Arthurian each had received $ 170,000; thereafter Miller had no further right to income. Arthurian also had some rights in other profits unrelated to the jingles or ID's. Arthurian made no capital contribution to Cameo, and its sole asset was its limited partnership interest in Cameo. Distributions were paid by Cameo to Arthurian. Like Gawain, Arthurian transferred its money to the Esoterian Society. In addition to selecting her as general partner of Cameo, O'Murphy asked Dahl to perform other functions. As shown below, she became general partner in Advanced, one of the lessee partnerships. Additionally, in late 1983, *271 O'Murphy asked Dahl to prepare a survey of the jingles industry. Dahl's "Comprehensive Survey" was completed on April 21, 1984, after the purchase and leases in question. Most of the information contained in Dahl's "Comprehensive Survey" was supplied by O'Murphy, with some contributions from RABI. C. Establishing Prices to the Lessor Partnerships
The jingles cost Egan and RABI no more than $ 1,500 to produce, and Egan had sought a cash payment of $ 2,000 per jingle. The ID's cost approximately $ 5,700 to produce. Upon their sale, Egan required a payment of $ 10,000 in cash and short-term notes. For purposes of the sales to the lessor partnerships, however, O'Murphy determined a purchase price of $ 38,900 per jingle and $ 280,000 per ID. He determined these prices in the way he had determined prices in the master recording tax shelters -- that is, he first determined the amount of "leverage" that would be necessary to make the tax shelter attractive to investors, and then he backed that amount into the actual price itself. RABI would receive the requested $ 2,000 in cash per jingle and $ 10,000 in cash or short-term notes per ID. The balance -- $ 36,900 per jingle and *272 $ 270,000 per ID -- took the form of long-term notes of the lessor partnerships. O'Murphy did not negotiate the amount of the notes with Egan. He simply told Egan the amount and Egan accepted his determination. III. Terms of the ID Sales
On December 4, 1982, RABI entered into a contract with Masterwork for the purchase and sale of four ID's for a total purchase price of $ 1,112,000. The required cash down payment was $ 40,000 and the $ 1,080,000 deferred balance was payable under a "promissory note" due in 12 years with simple nonrecourse interest at a stated rate of 10 percent. On December 4, 1982, RABI agreed to sell to Cameo 10 ID's at a price of $ 280,000 each, as set forth in an "option and purchase agreement". That price was subject to adjustment to conform to subsequent appraisals. The parties then executed a purchase agreement, also dated December 4, 1982, between Cameo and RABI for all 10 ID's. The agreement called for a total purchase price of $ 2.8 million, of which $ 100,000 was payable in cash and the $ 2.7 million balance in a long-term note due in 12 years with nominally recourse interest. It was signed on behalf of Cameo by Kaydence G. Mounce, a member *273 of O'Murphy's office staff, "as attorney in fact for Sondra C. Dahl". The ID's were magnetic tape master sound recordings similar to the master sound recordings that had been used in O'Murphy's earlier tax-oriented transactions. The practical difference was that the purchasers of reproductions from these master recordings were to be commercial advertisers, not the record-buying public. Sometime in early 1983, Vincent Trauth (Trauth) prepared a report regarding three ID's later leased by Pacific from Masterwork. Trauth was a composer and producer who later worked for RABI on many of the subject jingles. His appraisals generally supported the values assigned to the I.D.'s by the purchase agreements. Trauth arrived at a fair market value of $ 305,000 for each ID -- or, in his terms, for each "Superb quality station identification and image package". The ID sales agreements provided that the purchase notes would provide for "mandatory prepayments" to RABI in an amount equal to 50 percent of gross receipts. The gross receipts were to be derived from the exploitation of the ID's. They did not include lease payments directly from the lessees. IV. Terms of the Jingle Sales
*274 Following discussions in early 1983, Egan and Crockett undertook to produce a 500-jingle library for sale to O'Murphy's and Miller's associates. Egan and Crockett contemplated that the library would be produced with an emphasis toward in-store "point-of-purchase" advertising for car dealerships, grocery stores, and retail malls, as well as for the traditional markets of television and radio stations. Production of the jingles began in April of 1983. In four separate transactions, Masterwork and Cameo acquired a total of 170 such jingles. As contemplated, they paid RABI $ 2,000 in cash for each jingle with 5 or 6-year notes for the payment of the $ 37,800 balance. Like the ID's, the jingles were sold in the form of master sound recording tapes, whose reproductions would be marketed to commercial users. The first transaction involved RABI's sale of 50 jingles to Masterwork as of April 12, 1983. The terms called for the payment of $ 100,000 in short-term installments and $ 1,845,000 in the form of a note payable in 5 years. Amounts equal to 60 percent of "gross exploitation proceeds" were to be allocated to RABI as mandatory prepayments of the long-term notes. Interest accrued *275 at a rate of 9 percent annually. Two more purchases occurred on July 31, 1983. In one, RABI sold Masterwork 61 jingles for a total price of $ 2,372,900, of which $ 122,000 was in cash plus a promissory note for $ 2,250,900 due in 6 years. The note called for mandatory prepayments equal to 74 percent of the "gross exploitation receipts" received by Masterwork. In the other transaction, as of that same day, RABI sold Cameo 59 jingles for $ 118,000 cash, plus a promissory note due in 6 years of $ 2,180,000, with interest computed at 9 percent per annum. The note again called for mandatory "prepayments" of 74 percent of the "exploitation receipts" received by Masterwork. The remaining sales of jingles took place as of January 15, 1984. RABI sold Masterwork 20 more jingles for $ 40,000 cash, plus a promissory note due in 6 years of $ 738,000. The note called for mandatory prepayments of $ 4,000 plus "rebated costs", plus an amount equal to 74 percent of the "exploitation receipts" received by Masterwork. The "rebated costs" were those costs of selling that the distributor might rebate to the lessee. The purchase agreement for these 20 jingles, dated January 15, 1984, also called *276 for the execution of a subordinated nonrecourse promissory note for $ 1 million over and above the amounts called for by the $ 39,800 per jingle purchase price. The parties apparently have ignored the existence of this $ 1 million note. The last sale took place on the same date; it involved the sale and assignment of seven jingles from Cameo to Masterwork. The transaction called for the assignee, Masterwork, to pay $ 14,000 cash to Cameo and also to pay to the producer RABI any portion of the initial cash payment of $ 52,000 which Cameo had failed to pay. The rest of the deal was like the others; it involved a promissory note of $ 258,200 due in 6 years with interest computed at 9 percent per annum. The note again called for mandatory "prepayments" equal to 74 percent of the "exploitation receipts". As part of the assignment, the note obligation was transferred from Cameo to Masterwork. All the jingle purchase agreements between RABI and the lessors Cameo or Masterwork provided that RABI would provide two appraisals of the jingles sold. The first sale of 50 jingles provided that, if the value determined by the appraisals was less than the purchase price set forth for any of *277 the jingles, the purchase price would be reduced. Alternatively, for the other jingle partnerships, the purchaser of the jingles could require that more jingles be produced, so that the total appraised amount of the jingles would match the amounts called for as a total purchase price in the agreements. For all but the first 50 jingles sold, the producer's furnishing of two appraisals was a condition to requiring the purchasers' payment of the purchase price. One set of appraisals was prepared in 1985 by Gerald Ferri (Ferri), a former employee of RABI who had been retained at the behest of Merrill Osmond. His appraisals consisted of voluminous general material copied from other sources, much of which was included in Dahl's earlier "comprehensive survey", plus a check sheet and cover sheet for each jingle. The appraisals generally supported the prices set by O'Murphy. In the case of Assured, the appraisals consisted of copied material accompanied only by a list of jingles and a dollar figure ascribed to each. Second appraisals were not provided until shortly before the trial of this case. All agreements between the seller, RABI, and the purchasing lessor partnerships, whether *278 for jingles or for ID's, provided that the seller would not proceed against the lessor partnership's limited partners for distributions due RABI, unless the proceeds to the lessor exceeded specific percentages of gross proceeds. The purchase agreements also called for the execution of UCC-1 financing statements to secure RABI's interest as a creditor in the sound recordings of the jingles or ID's. No such forms have been filed. The agreements additionally provided that payments from exploitation of the jingles and ID's made by the distributor, which in fact was RABI, could be paid directly to the producer, also RABI, as the presumed "prepayments" of the notes. Thus the parties provided that no money would have to change hands; RABI would collect the proceeds and keep its share. To that extent, the lessor and lessee partnerships would be excluded from the flow of funds. The agreements further provided that RABI was to obtain copyrights and to provide them to the purchasers of the ID's. RABI failed to obtain such copyrights. RABI's president, Dwight Egan, did not know who, if anyone, was liable on the promissory notes signed in conjunction with his sale of the jingles and ID's *279 to Cameo and Masterwork. When the purchases were made, Egan knew little about Whiteley, Dahl, or their personal finances. Egan did not know the structure or function of Cameo or Masterwork or even that Whiteley and Dahl were connected to those partnerships. Nor was he aware of the relationship between the lessee partnerships and the lessor partnerships. He did not investigate the creditworthiness of the makers of the purchase notes. The purchase agreements specified that upon default by the lessors, RABI would repossess the jingles. The agreements also contained language whereby, in the event of such repossession from the lessors, RABI would nevertheless agree to pass the investment tax credits through to the lessee partnerships to avoid recapture of the credits already passed through. During the course of discussions with O'Murphy, Egan had prepared some projections of income for the jingles. His projections anticipated leases for in-store "point-of-purchase" advertising as well as conventional leases to broadcast stations. For the in-store leases, Egan assumed a 50-jingle library, a rental of $ 50 per store per month, and a $ 500 down payment. For sales to broadcasters, *280 he assumed that broadcasters would pay $ 3,500 per sale. He added other amounts to reflect foreign sales. Egan's projections showed a loss of $ 2,976.08 for the first year, cumulative net income of $ 138,047.84 for the second year and a total of $ 11,193,310 in cumulative net income by the end of the 13th year. Egan also projected different results based on higher or lower rental payments. Masterwork also purchased from RABI a master sound recording of an album entitled "Hot-Shot" with vocal performances by Jimmy Osmond, one of the Osmond family. The transaction was dated December 23, 1982. RABI had acquired the master sound recording earlier that year for $ 20,000. The stated purchase price to Masterwork was $ 1,617,000, payable $ 35,000 in cash, and the balance, about $ 1,582,000, in the form of a long term promissory note, due 12 years after purchase. The purchase provisions were generally the same as those for the jingles and ID's. Whiteley discussed the purchase on a few occasions with O'Murphy. The general terms of the purchase notes showed that, after the purchases, Masterwork owed $ 7,753,900 to RABI. Masterwork reported consistent losses between 1982 and 1987. *281 By August 31, 1986, its indebtedness, according to the balance sheet on its cash method tax return, totaled $ 7,420,266. After the notes were signed, Cameo owed $ 4,622,000. The terms of the purchase notes for the jingles required payment within 5 or 6 years. RABI later agreed to a 5-year extension of the terms for payments on promissory notes by Cameo and Masterwork. In exchange for this extension, the lessor partnerships released RABI from its obligation to produce additional jingles for the partnerships in the event that the appraised values of the jingles fell below the price called for in the purchase agreements. RABI did not carry the lessors' notes as assets on its books, because, from an accounting and financial standpoint, its principals were uncertain as to the notes' collectibility. Egan and his associates would not have presented them, for instance, to a lender as collateral for a loan. In a registration statement later filed with the Securities and Exchange Commission, Egan and Crockett explained that, as of April 1986, "The promissory notes due BP [i.e., RABI] from the jingle owners were disregarded in the determination of book value because of the Company's belief *282 that the notes would not be collected." In a later Amendment Egan and Crockett changed this view to state that the jingle owners' notes were disregarded because of their "doubt that the notes would be collected." No reason is given for the change. Both versions of the statement were made after the first pleadings in these consolidated cases were filed. V. Leasing the Jingles and ID's
O'Murphy arranged for Masterwork to lease its jingles and ID's to Pacific, Advanced, Audio, and Assured. O'Murphy also arranged for Cameo to lease its jingles and ID's to United and to Station I.D. O'Murphy, as attorney, represented both the lessor and the lessee partnerships at all relevant times for all matters relating to the leases of the jingles and ID's. He established various lease rates for the jingles, all at approximately $ 9,000 annually. He established the lease rate for the ID's at approximately $ 65,000 per year. The leases reflect the lessors' purchase agreements in significant ways. For Assured, Advanced, and United, the lessor partnerships agreed to provide, within 150 days of the commencement of the lease, two independent appraisals to the lessee partnership which would *283 substantiate the value of about $ 38,900 per jingle. If the average appraised value were less than $ 38,900 per jingle, the lessor partnerships were required to provide, at no cost, additional jingles, or to remaster jingles, sufficient to raise the combined average value of all jingles to $ 38,900. The appraisals apparently were to be those originally furnished by RABI to the purchasing lessor partnerships. Ferri's jingle appraisals, however, were not furnished until 1985, and the second set of appraisals were not delivered until 1990. Under the express terms of the leases and the lease notes with which the lessee partnerships paid substantial portions of the lease payments due, the individual general partners of the lessee partnerships are not personally liable for their partnerships' lease note obligations, beyond their partnership contributions. Only the corporate general partners are liable on the lease note obligations. Although Audio's general partner Lance Johnson urged that he was liable for Audio's lease debts, he could not estimate the amount of that liability within $ 1 million. Moreover, his beliefs are not consistent with the documents he executed, which specifically *284 provide that he will not be liable for partnership debts. Furthermore, each lessee partnership agreement provides that the individual general partners may insulate themselves from all personal liability in all of the partnerships' contracts. Under an oral agreement among the general partners, the terms of the notes given by the lessee partnerships to the lessor partnerships were extended to 1993. VI. Structuring of the Lessee Partnerships
Each lessee limited partnership consisted of an individual general partner, a corporation that served as a second general partner, and a number of limited partners. Limited partnership interests in the lessee partnerships were marketed like other conventional investment or tax-oriented packages. The investing limited partners paid a relatively small amount of cash down and executed short term notes. In addition, the investing limited partners also agreed to assume a pro rata share of the partnerships' lease note liabilities. Although the lessee partnerships operated at consistent losses, none has called upon any of the limited partners to pay the amounts of the assumed debt of the lessee partnerships. All of the general partners of *285 lessee partnerships understood that their jingles would become part of a pool of the 537-jingles library for purposes of marketing and revenue sharing. Prior to 1986, the partnerships relied heavily on O'Murphy for the management of the partnerships. The particulars of petitioners' investment lessee partnerships are set forth below. A. Pacific Sound Production Limited Partnership
Gerald Henning (Henning) was the individual general partner of Pacific. Pacific Music, Inc., was its corporate general partner. Upon becoming a partner, Henning executed his note for $ 5,000. O'Murphy assisted Henning in incorporating Pacific Music, Inc., at the time the Pacific partnership was formed. Henning was the director and sole employee of Pacific Music, Inc., which was capitalized with $ 220. Pacific Music, Inc., later was dissolved because Henning did not file the necessary documents with the State of Washington. Before becoming involved with Pacific, Henning had no experience with jingles, commercial music advertising, or master recordings. Henning's principal occupation is as a real estate salesman, and previously he held accounting positions with a soft drink distributor and a *286 roofing company. Henning discussed the jingle and ID transactions only with O'Murphy. Although Henning had only known O'Murphy for a short time, he relied heavily on O'Murphy in deciding to commit Pacific to the jingle-ID project. Any revenue projections that Henning reviewed were informal. Henning had no significant familiarity with the concept of marketing the jingles as a library. The offering materials for Pacific provided that an investor in a limited partnership interest would be one of a maximum of 35 subscribers. The investor would purchase a minimum of 25 units at $ 220 per unit cash down and $ 220 per unit payable by a short-term note, for a total contribution of $ 11,000. Each limited partner would also assume personal liability up to a maximum of $ 560 per unit ($ 14,000 for 25 units) for the partnership's note obligations. The offering material further provided that the corporate general partner of Pacific would receive, from the lessor, finder's fees of $ 29,750 and placement fees of $ 11,550. The corporate general partner could claim a reimbursement of expenses of $ 1,000 per month; and further, "The Corporate General Partner and associated officers, directors *287 and employees are expected to receive a significant portion if not all of the sales commissions, Twenty-Six Thousand Two Hundred Dollars ($ 26,200)". The Pacific offering materials prominently stated that for income tax purposes, an investment of $ 5,500 in 1982 would generate $ 11,000 of investment tax credit and a $ 2,619 deduction, "a 4.476 to 1 ratio for a 50% bracket taxpayer." The materials further advised that $ 5,500 invested in 1983 would produce "a 3.6 to 1 ratio for a 50% bracket taxpayer". Additionally, for 1984, "with no investment required, an additional $ 2,024 can be written off." The materials further advised that the partnership would establish a legal defense trust fund to defend the partnership and its partners in the event of an audit by the Internal Revenue Service. Pacific leased four ID's and eight jingles from Masterwork, in an agreement entered as of December 31, 1982. Pacific also leased the Jimmy Osmond "Hot-Shot" master sound recording at a lease rate of $ 149,725 per year, payable $ 57,213 in cash, with the balance in the form of long term notes. The leases were for a term of 9 years. In 1982, Pacific received and accrued no income. Pacific reported *288 a $ 5,094 loss in 1982; in 1983, for Federal income tax purposes, Pacific reported a loss of $ 376,964. B. Station I.D. Limited Partnership
O'Murphy asked Ron Colwill (Colwill) to head the Station I.D. Limited Partnership. Colwill and his wife are the sole shareholders of Colwill & Associates, Inc., which was incorporated in 1979. Colwill and Colwill & Associates, Inc., are the individual and corporate general partners, respectively, of Station I.D. The Station I.D. partnership paid O'Murphy for compiling the offering memorandum for the partnership, for putting the preliminary profile together, and, generally, for consultation. Colwill sold several jingle limited partnership interests to investors who had been his investment-counseling clients; he earned approximately $ 8,000 in commissions from these sales. Colwill considered investments in the jingle limited partnerships to be tax-advantaged investments. He collected $ 332,800 in cash as capital contributions upon the sale of limited partnership interests. In 1982 and 1983, Colwill & Associates, Inc., the corporate general partner of Station I.D., received sales commissions totaling $ 32,000. Of that amount, Colwill *289 paid approximately $ 26,000 to the individual salesmen who actually sold the partnership interests. Colwill & Associates, Inc., also received $ 33,000 as lease placement fees. Colwill first met Egan and Crockett at a convention in California after his partnership had already leased the ID's and executed a distribution agreement with RABI. Station I.D. took out two "key man" life insurance policies with a face amount of $ 150,000 on the lives of both Egan and Crockett. Colwill received a $ 1,400 commission on the sale of these policies. At the time of trial, Colwill could not recall Station I.D.'s lease liability to Cameo. One of Colwill's customers was David Elsworth (Elsworth), himself by profession a financial planner. Elsworth's principal reason for investing in Station I.D. was to save taxes. Elsworth himself has sold a variety of financial products, including limited partnership interests. He is also a limited partner in Audio and in two other jingles partnerships, and he is the individual general partner in another, Effective Communications, which is not a party to this case. Elsworth also sold limited partnership interests in the jingle-ID partnerships, receiving *290 about $ 75,000 in commissions from his sales. Elsworth stressed the tax benefits when selling such limited partnership interests. Elsworth later assumed a role in apportioning and distributing the payments received from RABI to each of the lessee partnerships. To subscribe to a limited partnership interest in Station I.D., an investor was required to purchase a minimum of 25 units at $ 200 per unit in cash. The investor was also required to execute short-term notes, payable in monthly installments, in a total amount of $ 240 per unit. His total contribution was $ 11,000. The offering material further provided that each of the limited partners would assume personal liability of up to $ 480 per unit (or $ 12,000 for 25 units) with respect to the partnership's lease note, signed in 1982. In the event of full subscription, the Station I.D. corporate general partner was entitled to a total of $ 38,500 in lease payment fees, plus an organizational fee of $ 38,500 from which commissions for the sale of partnership interests could be made. The corporate general partner was also entitled to receive expense reimbursements of up to $ 972 per month, although no more that $ 3,000 of these *291 reimbursements could be paid from working capital. The offering materials for Station I.D. advised that "the ratio of write-off to investment in 1982 is 3.2 to 1 for a 50% tax bracket investor, and 3.11 to 1 in 1983." Station I.D. agreed to provide legal defense should it, or its partners, be audited by the Internal Revenue Service regarding tax benefits claimed as a result of investing in the partnership. The private placement memorandum included a 98-page, single-spaced "Federal Tax Opinion" drafted by the Law Offices of Michael O'Murphy and signed by him and two associates. It was addressed to Colwill and to Joseph Misiuda, of Colwill and Misiuda, Inc., a predecessor of Colwill & Associates, Inc. The Opinion discussed the "Federal Income Tax Consequences incident to the formation and proposed offering of interests in Station I.D. Limited Partnership". Station I.D. leased 8.8 ID's from Cameo for a 15-year term. Although it was contemplated that Station I.D. would lease all 10 of the ID's Cameo purchased from RABI, the Station I.D. partnership was not fully subscribed, so only the 8.8 unit interest was leased. The lease called for an annual rental of $ 66,115 per ID, payable *292 $ 123,000 in cash and the balance over a period of 10 years. In 1982, Station I.D. received and accrued no income. It reported a $ 6,951 loss for Federal income tax purposes. In 1983, Station I.D. reported a loss of $ 602,800 for Federal income tax purposes. By 1987, the principal and interest balance on its lease note was $ 3,278,660. C. Advanced Communication Limited Partnership
Sondra Dahl is the individual general partner of Advanced Communications; she is also the president and sole shareholder of Advanced Productions, Inc.The corporation was formed in December of 1983, to operate as the corporate general partner of Advanced. O'Murphy has been an individual limited partner in Advanced since its inception. Prior to having Advanced lease the subject jingles, Dahl consulted only with O'Murphy and RABI and with no one else in the jingle-ID industry. To subscribe to a limited partnership interest in Advanced, an investor was required to purchase a minimum of two units at $ 2,650 per unit cash down, plus short-term notes for $ 2,650 and another $ 1,050 per unit, for a total investment of $ 12,700. The Advanced subscription agreement indicated that the limited partner *293 would assume personal liability for a maximum of $ 7,410 per unit of partnership lease notes, which were signed in 1983 and 1984. The private placement memorandum stated that an organizational fee of $ 18,550 and a lease placement fee of $ 48,000 were to be paid to the corporate general partner. From these amounts, some portion could be paid to employees or as commissions to broker-dealers. The corporate general partner was entitled to $ 1,250 per month as overhead expense reimbursement, but this amount was limited to $ 21,225 of payment from the limited partners' capital contributions. The Advanced offering materials included a table entitled "Cash Flow and Tax Effects to a Limited Partner". The table showed that, in 1983, a minimum contribution of $ 5,300 would produce a partner's "Equivalent Profit/(Loss)" -- that is, an equivalent to total tax deductions -- of $ 14,255. For 1984, another $ 5,300 would yield equivalent deductions of $ 15,218, and for 1985, the final payment of $ 2,100 would yield equivalent tax deductions of $ 8,450. For 1983, these figures suggest a "write-off ratio" of 2.69 to 1; for 1984, a ratio of 2.87 to 1, and for 1985, a ratio of 4.02 to 1. The *294 total write-off ratio for the 3 years in which a limited partner was to make cash investments was 2.98 to 1. In the offering materials, Advanced advised that it would set up a legal defense fund to benefit the partnership and its partners in the event that the Internal Revenue Service questioned the deductions and credits claimed as a result of Advanced's activities. Exhibit 6 in the offering materials is a 69-page "Federal Tax Opinion" written to Sondra Dahl and signed by "Law Offices of Michael O'Murphy, P.S." In a document dated as of December 1, 1983, Advanced leased 33 jingles from Masterwork, at an annual rate of $ 9,000 per jingle. The term of the lease was 6 years, with an option to renew for four additional terms. The original "license and lease agreement" contemplated the lease of 61 jingles for a total rental of $ 549,000, but it listed only 33 specific jingles. Subsequent lease notes indicated that only 33 jingles had been leased for total annual lease payments of $ 297,000. In 1983, Advanced received and accrued no income. It reported a $ 26,636 loss for Federal income tax purposes. In 1984, Advanced reported a loss of $ 338,618 for Federal income tax purposes. *295 It continued to report losses consistently through 1987, and its accrued principal and interest obligations on its lease note increased steadily. By 1987, the principal and interest balance was $ 1,299,002. The general partner admitted that she had financial problems and diverted partnership funds for her own use and had falsified partnership records. D. United Communications Limited Partnership
David Ream was the original individual general partner of United Communications Limited Partnership (United). The corporate general partner was United International, Inc. John Essley (Essley) owned stock in United International, Inc. as a result of his investment of $ 15,000 in that company. The corporation participated in promoting various business ventures before it became involved with the United partnership. Pursuant to an allegedly unauthorized use of the United partnership subscription funds, however, Essley lost his $ 15,000 investment. Nevertheless, he thereafter purchased a 10 percent interest in the United partnership and executed a guarantee, up to $ 250,000, for United's effort to market its jingles. Essley, with the assistance of O'Murphy, formed Communications *296 Marketing, Inc., to replace United International, Inc., as the corporate general partner of United. Essley is the president and sole shareholder of Communications Marketing, Inc. It was initially capitalized with $ 500. Essley became the individual general partner of United in January of 1985. Neither Essley nor Communications Marketing, Inc., was required to pay a capital contribution to United upon assuming the role of general partner of United. Essley became a limited partner in United in December of 1983; he also invested in Assured as a limited partner. Essley had earlier invested in a master recording venture called Structured Shelters that had proved to be unprofitable. He had some discussions with acquaintances in the advertising industry before becoming involved with the jingle venture. Essley's principal interest in investing in the jingle partnerships was the tax benefit to be gained from such an investment. To subscribe to a limited partnership interest in United, an investor had to purchase a minimum of 20 units at $ 250 per unit, for a total of $ 5,000 cash down, as well as $ 7,000 payable by short-term notes, for a total contribution of $ 12,000. United's *297 subscription agreement provided that the limited partner would execute notes to assume personal liability for a maximum of $ 765 per unit with respect to the partnership's lease notes signed in 1983 and 1984. The corporate general partner of United was entitled to receive an organizational fee amounting to $ 17,500, if the offering was fully subscribed. It was also entitled to a lease placement fee, upon a full subscription of the units, of $ 45,000. Some portion of these fees could be paid to salespeople and to bona fide finders. The corporate general partner was also entitled to receive monthly management fees of $ 1,250, not more than $ 21,000 of which could come from the limited partners' capital contributions. The United offering materials, like those of Advanced, included a table entitled "Cash Flow and Tax Effects to a Limited Partner." The table showed that, in 1983, a minimum contribution of $ 5,000 would produce a partner's "Equivalent Profit/(Loss)" -- that is, an equivalent to total tax deductions -- of $ 15,121. For 1984, another $ 5,000 would yield equivalent deductions of $ 14,595, and for 1985, the final payment of $ 2,000 would yield equivalent tax deductions *298 of $ 6,649. For 1983, this implied a "write-off ratio" of 3.02 to 1; for 1984, a ratio of 2.92 to 1, and for 1985, a ratio of 3.32 to 1. The total write-off ratio for the 3 years in which a limited partner was to make cash investments was 3.03 to 1. United also was required to establish a legal defense fund to pay for its, or its limited partners', legal defense in the event of an audit. A Federal tax opinion from O'Murphy's law offices was addressed to David Ream and was incorporated into the United placement memorandum as a 68-page exhibit. Although it originally contemplated leasing 59 jingles, United ultimately leased 17 jingles from Cameo at a rate of approximately $ 9,000 per year, for a 5-year term, renewable four times. The parties dated their original agreement as of October 23, 1983. In 1983, United received and accrued no income. It reported a $ 26,676 loss for Federal income tax purposes. In 1984, United reported a loss of $ 206,336 for Federal income tax purposes. It continued to report losses consistently through 1987, and its accrued principal and interest obligations on its lease note increased steadily. By 1987, the principal and interest balance on "lease *299 notes payable" was $ 750,725. E. Audio Advertising Limited Partnership
Lance Johnson (Johnson) is the individual general partner of Audio Advertising Limited Partnership. Johnson has been involved in selling tax-advantaged investments since 1982. Other than his involvement with the subject partnerships, Johnson has no experience in the advertising, radio, or music industries. He sold a number of limited partnership interests, including interests in the Station I.D. and Audio partnerships. Johnson received $ 4,000 to $ 5,000 (or 8 to 10 percent of total sales) for sales of jingle-ID limited partnerships. In addition to being the individual general partner, Johnson is a limited partner in Audio. Late in 1982 or in 1983, Johnson moved into an office he shared with Colwill. Audio Creations, Inc., is the corporate general partner of Audio. Johnson is the sole shareholder, president, and only officer of Audio Creations, Inc. Johnson formed Audio Creations, Inc., with the assistance of Michael O'Murphy. Audio Creations, Inc., was formed to operate as Audio's corporate general partner. Johnson contributed $ 500 in cash, plus a personal note, to capitalize Audio Creations, *300 Inc. Johnson has described the Audio partnership as a "Tax Shelter". From the outset, Johnson understood that O'Murphy was involved in the jingles partnerships, but he never understood exactly what O'Murphy's role was in the venture. Johnson anticipated that the Internal Revenue Service would question the positions taken by Audio on its partnership return. Investors in Audio each purchased a minimum of 20 units at $ 275 per unit in cash and short-term notes, as well as $ 225 per unit in the form of a short-term notes, for a total contribution of $ 10,000. It was contemplated that a limited partner would also assume personal liability for a maximum of $ 790 per unit regarding the partnership's lease notes signed in 1983 and 1984. In the event of full subscription, the corporate general partner of Audio was entitled to receive an organizational fee of $ 17,500, and a lease placement fee of $ 35,000, but some of these amounts could be paid as commissions or finders fees to other salespeople. The corporate general partner was also entitled to receive monthly management fees of $ 1,000. The offering materials of Audio contained neither a projection of expected income, nor a projection *301 of the tax incidents of investing in the partnership. Nevertheless, the offering materials for Audio indicated that, if fully subscribed, 35 partners would purchase 20 units apiece. These limited partners would receive 99 percent of the losses and tax credits. According to the figures reported for 1983, each partner would receive 1/35 of 99 percent of $ 253,328 in losses, or $ 7,165.56, plus 1/35 of 99 percent of a tax credit of $ 159,768, or $ 4,519.15. According to the "equivalency" figures attributed to other partnerships, this would result in the first-year $ 5,500 cash investment yielding tax deductions of $ 16,203.86, a "write-off" ratio of 2.95 to 1 for 1983. As is the case with the other petitioner lessee partnerships, a legal defense trust fund was required to be set up by Audio to defend the partnership and its partners in the event of an audit of claimed tax benefits by the Internal Revenue Service. And as was the case with the other lessee partnerships, the offering material contained a Federal tax opinion from the "Law Offices of Michael O'Murphy." This one was addressed to Johnson and was 75 pages long. Although the parties originally contemplated leasing 50 jingles, *302 Audio actually leased 42 jingles from Masterwork for a 5-year term, renewable for a second 5-year period at a rental to be determined at the time of renewal. The agreement was dated as of April 12, 1983. The initial rentals were set at $ 9,000 per jingle per year. In 1983, Audio received and accrued no income. It reported a $ 253,328 loss for Federal income tax purposes. In 1984, Audio reported a loss of $ 415,734 for Federal income tax purposes. It continued to report losses consistently through 1987, and its accrued principal and interest obligations on its lease note increased steadily. By 1987, the principal and interest balance was $ 2,104,430. F. Assured Communications Limited Partnership
Robert Davidson (Davidson) is the individual general partner of Assured; he is also the sole shareholder of General Productions, Inc., the corporate general partner of Assured. He has a background in toy manufacturing, selling candy and snack foods, and direct mail advertising. Davidson first met O'Murphy in April or May of 1984, and O'Murphy asked Davidson to become a general partner of Assured. In deciding to become involved, Davidson consulted with O'Murphy, Egan, Crockett, *303 Colwill, and Elsworth. Davidson did not consult with any independent person currently in the jingle production or jingle marketing industries prior to becoming a general partner in Assured. Davidson reviewed some income projections concerning the jingles. He believed these projections came from RABI/BI. Davidson was aware that all cash flow pro formas look good because they are designed to look good for the investor, his banker, and his accountant. Davidson formed General Productions, Inc., at O'Murphy's behest, solely to be the corporate general partner of Assured. Davidson did not put any capital into the corporation. The sole asset of the corporate general partner of Assured was its partnership interest in Assured. Davidson represented that his personal net worth was substantial. At trial, Davidson did not know, without reviewing documents, the terms of his partnership's current lease rate with Masterwork. Davidson acknowledged that he had no exposure to personal loss in the jingles transaction. As a general partner of Assured, Davidson was told by O'Murphy that he had no personal economic exposure either as the individual general partner or as the sole shareholder of *304 the corporate general partner. As a corporate general partner, Davidson's wholly owned corporation was paid a $ 12,000 organizational fee; it also received a "loan placement fee" of approximately $ 30,000. Davidson also received management fees of $ 12,000 to $ 14,000 over a 2-to-3-year period, plus sales commissions in connection with the sales of limited partnership interests in Assured. The typical investor in Assured was expected to purchase one unit, at $ 5,000 in cash per unit, plus $ 3,000 per unit payable by a short term note, for a total contribution of $ 8,000. The limited partner would also assume personal liability for a maximum of $ 11,643 per unit of the partnership's lease notes signed in 1984 and 1985. The offering materials for Assured contained a "Limited Partner Summary" which indicated that an investment in the limited partnership would yield an "equivalent income/loss" of $ 15,574 for 1984, $ 7,529 for 1985, and $ 2,273 for 1986. Thus, a limited partner who invested the minimum $ 8,000 cash would achieve an average write-off ratio of 3.17 to 1. Again, the offering materials provided, "A Tax Defense Fund will be established * * * to retain appropriate counsel *305 if the partnership or any Limited Partner is challenged by the Internal Revenue Service with respect to any deductions taken." The offering materials also contained a 70-page Federal tax opinion, addressed to Davidson, and indicating the signature of Michael O'Murphy. In an agreement dated as of March 1, 1984, Assured leased 55 jingles from Masterwork, at an annual rental of $ 9,000 per jingle per year, for a period of 6 years, subject to renewal for four more terms. In 1984, Assured received and accrued no income. It reported a $ 630,313 loss for Federal income tax purposes. For 1985, Assured reported a loss of $ 599,302 for Federal income tax purposes. It continued to report losses consistently through 1987, and the accrued principal and interest obligations on its lease note increased steadily. By 1987, the principal and interest balance was $ 1,743,143. VII. Distribution Arrangements
Upon leasing the jingles or ID's, the lessee partnerships entered into distribution agreements with RABI. RABI's Egan and Crockett had little experience in marketing ID's to radio or television stations prior to agreeing to market the subject ID's. Neither had experience or knowledge *306 of in-store broadcasting of jingles prior to agreeing to market the subject jingles for petitioners. Egan and Crockett and Merrill Osmond made it clear that promotion of the jingles and ID's was not going to be their full-time occupation. Nevertheless, they devoted a substantial amount of their time to producing the jingles and to developing the in-store satellite marketing method. A. Distribution of ID's
The preliminary distribution concept was that, in general, RABI would perform the radio station and in-store advertising sales of the ID's. JPD Enterprises, Inc., or JPD Television Network (JPD-TV), headed by Dan Miller's acquaintance Jim DeVaney, was to do television distribution of the subject ID's. Supposedly the primary market for the ID's would be low-powered television (LPTV) stations. LPTV in concept enables small communities to acquire a local television station capable of broadcasting to a relatively short distance of 8 to 10 miles. Low power television stations did not exist in any meaningful fashion in 1982, but the promoters claimed to be interested in the possibility of future licensing of such stations. The nonexclusive distribution agreements for marketing *307 the ID's between RABI and Pacific and between RABI and Station I.D. both contemplated that an agreement would exist between Pacific and JPD-TV, and between Station I.D. and JPD-TV. As a result, RABI would be excluded from marketing to stations first contacted or solicited by JPD-TV. Neither Pacific nor Station I.D., however, ever executed any agreement with JPD-TV. DeVaney did make one proposal to distribute the ID's, but it was rejected by O'Murphy and the lessee partnerships. The distribution agreements that existed between RABI and Pacific, and between RABI and Station I.D. each contemplated that a full-time person under the supervision of Egan and Crockett would market each partnership's ID's. RABI's employee Gerald Ferri had been tentatively selected for this task but Ferri left the company and never engaged in marketing efforts with respect to the ID's here involved. The agreement between RABI and Pacific indicated that RABI would receive an advance of $ 8,696 for its services as distributor. RABI agreed to charge at least $ 2,500 for a 3-year rental of a customized ID. During its term as distributor, RABI reported that it had incorporated "I.D. material" in a syndicated *308 radio show, "Top 30 USA". It further reported that it had customized six LPTV ID packages, one of them for JPD-TV itself. During 1983, Station I.D. received $ 9,376 in income from the use of the ID's on RABI's "Top 30 USA" syndication. During the same year, Station I.D. paid $ 24,854 for promotion and marketing. The Station I.D. partnership also engaged in a distribution contract with Star Plus, Inc., a Utah corporation headed by Milo Bishop (Bishop) who also was connected with RABI. No serious effort was made to achieve commercial distribution of Pacific's "Hot Shot" album. B. Distribution of Jingles
RABI had nonexclusive distribution agreements with Audio, Advanced, United, and Assured, pursuant to which RABI would distribute the jingles on a national basis. The agreements between RABI and Audio, between RABI and Advanced, and between RABI and United all explicitly provided that Merrill Osmond was not required to provide any services to the limited partnerships, and they required Egan and Crockett to render only part-time services to the partnership. RABI did agree, however, to provide a national sales coordinator, supervision of regional salesmen, and regional salesmen *309 to work on the contracts. Under the contracts, RABI agreed to lease each partnership's jingle library for not less than $ 3,500 per year. The same flat fee for each library was to be charged although the number of jingles owned by the lessee partnerships varied considerably. Individualized, customized jingles would be licensed at $ 200 per year. RABI was entitled to specified fees in exchange for its services; in the contract with Audio, for example, it was entitled to $ 1,824.10 payable six times each year. RABI was also authorized to pay commissions of 20 percent. RABI's principal effort in selling the products was the hiring of Douglas Schearrer (Schearrer). Schearrer's assignment was to test market the jingles by lining up in-store customers. Schearrer talked with representatives of nine shopping malls, three car dealerships, several variety stores, two entertainment centers, and three hotels in Las Vegas. RABI's marketing employed the "MUZ-AD" plan. The MUZ-AD program involved placing a tape recorder in a store to play background music which would be interrupted by advertisements featuring the subject jingles. Schearrer's efforts resulted in the sales of MUZ-AD systems *310 to some car dealerships, shopping malls, small grocery chains and a few stores. When problems developed with the tape delivery system, Egan and Crockett changed the technique to utilize satellite dishes in Salt Lake City to transmit the in-store music and advertising. By March of 1984, some officials of Safeway, a large chain of grocery stores, had heard about RABI's tests of the in-store advertising. They indicated to RABI an interest in the in-store advertising efforts. Safeway executives suggested that before satellite dishes were put up, tape machines should be installed in Safeway's Salt Lake City stores on a test basis. RABI successfully installed and used the tape machines. RABI used the subject jingles in the advertisements. In September of 1984, Egan and Crockett arranged to meet with the Safeway officials. Egan contacted O'Murphy, as counsel for the jingle partnerships, and suggested that O'Murphy would want to be involved, because the meeting might have a significant bearing on and increase the use of the jingles. At the meeting, held on September 19, 1984, O'Murphy, Crockett, Egan, Merrill Osmond, and some others demonstrated the in-store advertising system which *311 operated through a satellite that had been installed on the roof of Safeway headquarters. The Safeway officials decided that they wanted to use the satellite system in their stores. Egan and Crockett asked O'Murphy to represent RABI in negotiating the Safeway contract, and he did so. In December of 1984, RABI entered into a licensing agreement with Safeway Stores, Inc. (Safeway). RABI agreed to provide point-of-purchase advertising and background music through satellite communications. Under the agreement, RABI was to get the first $ 125 per month for the advertising revenue, after which it would split those revenues with Safeway. None of the jingle partnerships is a party to the Safeway licensing agreement. Egan and Crockett later transferred RABI's in-store satellite business to another of their corporations, called Broadcast International (BI). RABI became an affiliated corporation with Broadcast International. For convenience, we shall continue to refer to RABI as including the entity through which Egan and Crockett conducted their in-store satellite business, making reference to BI only when necessary for clarity. Before the Safeway contract, RABI's marketing had focused *312 on smaller retail chains, or smaller retail stores. With Safeway on board, Egan and Crockett abandoned that effort. Safeway agreed to guarantee a loan to RABI through a bank where Davidson had some contacts. With O'Murphy's participation, RABI proceeded with the installation of the satellite system. Some problems developed with respect to placing the satellite receivers on the roofs of the Safeway stores involved. These problems delayed implementation of the program. Egan and Crockett realized that Safeway's existing marketing system could do a better job than they of selling the in-store advertising "spots". Safeway had established contacts with vendors who wished to sell their specific products in the Safeway stores. Accordingly, RABI got out of the business of selling "spots" directly. Instead, it concentrated on providing background services, such as contacting national manufacturers and sending its clients newsletters. Egan and Crockett used the subject jingles in approximately 80 percent of the spots transmitted over the satellite network. On behalf of the partnerships, Elsworth and Johnson made some preliminary inquiries about expanding the jingles to other markets, *313 but they decided against such an effort. Around this time, respondent's agents were investigating the activities of the partnerships. The partnerships began devoting substantial amounts of their funds to legal defense of the tax benefits offered by the partnerships. Also, Egan and Crockett had major disputes with O'Murphy, culminating in violent disagreements. After several months of dispute, RABI filed suit seeking an injunction against O'Murphy, with respect to their funds in the bank. The lawsuit was settled in 1986. Egan's view of the settlement was: "We had our business back, and him out of our lives." The lessee partnerships and their partners were not parties to the settlement, but the lessor partnerships were. Pursuant to the terms of that settlement, the lessor partnership Masterwork assigned all lease payments due from Audio, Assured, and Advanced to RABI. Additionally, the lessor Cameo assigned all lease payments due from United to RABI. The lessors' assignments reflect past due down payments, mandatory prepayments, and accrued aggregate interest under the purchase agreements. When (and if) the past due amounts are paid, the lessors will assign 85 percent of the *314 prospective lease payments to RABI as mandatory prepayments against each note. Additionally, pursuant to the settlement between O'Murphy and RABI, the parties modified the jingle purchase agreements. The new version changes the partnerships' remedy in the event appraisals of the jingle come to less than the purchase price. In that event, the parties will reduce the total purchase price and promissory note principal amounts to an amount equal to the average of appraised values. RABI thus was relieved of the possibility of an obligation to produce more jingles to make up the difference between the purchase price and the appraised values of the jingles already produced. RABI's agreement with Safeway does not require RABI to use the subject jingles or ID's on the satellite system for any of the in-store advertisements. C. The Amended Distribution Agreement with RABI as of January 1986
Although the lessee partnerships were not parties to the lawsuit or subsequent settlement between O'Murphy and RABI, their interests were affected. Therefore, in 1986, RABI entered into a new "license and royalty agreement" with each lessee partnership concerning the use of the jingles. The *315 station ID's were apparently not included through oversight. The testimony indicates that similar agreements were to be executed with respect to the station ID's. All these 1986 license and royalty agreements are essentially identical, except for the licensing amount. These 1986 license and royalty agreements essentially carry out the provisions of the settlement agreement between RABI and O'Murphy. Pursuant to these agreements, from January to June of 1986, the lessee partnerships allowed RABI as distributor to withhold and not to pay over 100 percent of the aggregate license fee, stated to be $ 50 per store per month. These amounts instead were applied toward paying the lessor partnerships' obligations, including the mandatory note prepayments. Thereafter, beginning in June 1986, the lessee partnerships allowed 90 percent of the aggregate monthly license fee, that is, $ 45 of the $ 50 per store, to be withheld by RABI to be applied to the lessor partnerships' past-due purchase payments and mandatory note prepayments. RABI paid the remaining $ 5 per store per month to Elsworth, to be divided among the lessee partnerships. Because their note liabilities were being thus reduced, *316 the lessor partnerships, Masterwork and Cameo, have allowed the lessee partnerships to reduce their lessee-note liabilities to the lessors pro tanto. For their part, the lessee partnerships have continued to reduce, pro rata, any assumptions of potential personal liability by their limited partners with respect to the partnership notes. RABI/BI reported to the Securities and Exchange Commission in 1988 that, pursuant to a "reorganization" in August of 1987, RABI pays the "jingle owners" $ 5 per month for each satellite station using the jingles. The report does not, however, mention the 90 percent assignment of royalty compensation as credits against the lessors' notes. The initial term of the 1986 license and royalty agreements was for 2 years, commencing August 1986, with an option to extend for a 5-year period at the lessee limited partnerships' discretion. Any further extensions would require the mutual agreement of the parties. RABI had no obligation to renew the royalty agreement beyond 1992. The following are the subject licensee partnerships' pro rata shares of both the cash and credit portions of the aggregate monthly license fees per store, paid pursuant to the 1986 *317 license and royalty agreement. These shares are based on the ratio that each partnership's agreed investment contribution bears to the aggregate contribution of all lessee partnerships, including those not parties to this action. $ 5 CASH
$ 45 CREDIT
TOTAL AUDIO ADVERTISING
$ 0.3006
$ 2.7054
$ 3.0060
ADVANCED COMMUNICATIONS
$ 0.2501
$ 2.2505
$ 2.5005
ASSURED COMMUNICATIONS
$ 0.4642
$ 4.1778
$ 4.6420
PACIFIC SOUND
$ 0.3068
$ 2.7612
$ 3.0680
UNITED COMMUNICATIONS
$ 0.1255
$ 1.1291
$ 1.2545
STATION I.D.
$ 0.3542
$ 3.1878
$ 3.5420
Over a 4-year period from January 1986 through December 1989, the partnerships received following total amounts: CASH
CREDIT AUDIO ADVERTISING
$ 18,119
$ 176,945
ADVANCED COMMUNICATIONS
$ 15,067
$ 147,189
ASSURED COMMUNICATIONS
$ 27,979
$ 273,248
PACIFIC SOUND
$ 18,489
$ 180,595
UNITED COMMUNICATIONS
$ 7,560 $ 73,845 STATION I.D.
$ 21,343
$ 208,497
Under the 1986 agreements, Egan supplies Elsworth, as the representative of all the general partners of the lessee partnerships, information as to the amounts that the notes are deemed to be reduced each month. No cash changes hands between RABI and *318 the subject partnerships for the note reduction payments of $ 45 per store per month. Elsworth also receives from RABI a portion of the $ 5 per store per month cash license fee and disburses the cash to each of the partnerships according to their pro rata shares, as set forth above. In practice, such payments have been used largely, if not entirely, for legal fees in the present litigation. When RABI and the lessees executed the 1986 licensing agreements, RABI was producing and broadcasting in-store audio advertising to approximately 771 Safeway Stores and 179 Payless stores. At time of trial, in 1990, there were about 2,500 stores on the RABI/BI system. In general, the history of the in-store broadcasting business indicates a willingness on the part of a retail company to expend no more than $ 2 to $ 3 per month per store for the use of a library of jingles, and the industry standard is closer to eighteen to twenty-five cents. At $ 5 per month per store, RABI was paying substantially more for jingles than anyone else in the in-store broadcast business. RABI does not plan to continue paying the lessees $ 50 per month if RABI no longer holds notes that would reduce its actual *319 cash payments to $ 5 per month. In 1987, Egan and Crockett's new in-store satellite company, BI, entered into a written contingent licensing agreement with RABI. This agreement provides that BI will be allowed to use the jingles at a rate of $ 1 per year per store, if RABI repossesses the jingles from the lessor partnerships for failure to pay the cash and notes when due. Following the settlement agreements in 1986, the lessee and lessor partnerships orally agreed that the rentals payable by each lessee to the lessor partnerships might be reduced to $ 1 per year, at least after the termination of the original lease. At the time of trial, however, the lessor partnerships and the lessee partnerships had not yet completed documents to that effect. Records of the jingle partnerships -- of the lessees Pacific, Audio, Assured, and Advanced, and of the lessor Masterwork -- indicate that a significant portion of the capital raised from the sale of limited partnership units ultimately was paid to O'Murphy, to the foundations he created, and the lessor and lessee general partners. VIII. Expert Opinions as to Valuation
A. Respondent's Experts
Respondent produced the reports *320 and testimony of several expert witnesses regarding the value of the jingles and ID's at issue. 1. Harry O'Connor
Harry O'Connor (O'Connor) has been in broadcasting and the station management business since 1944. Between 1960 and 1962, O'Connor created and produced ID's and commercials for Commercial Recording Corporation, then a leading producer of ID's and commercials. From 1962 to 1964, he was a partner in an organization which created and produced custom ID packages for major broadcasting stations. Between 1964 and 1968, he wrote and produced comedy commercials and programs. O'Connor is currently the president of O'Connor Creative Services (OCS), which he founded in 1968. OCS produces and markets musical production packages for approximately 1,500 broadcasting clients. The packages O'Connor's company produces and markets include generic jingles, custom jingles, and jingle libraries for the foreign market. O'Connor reported that the generic jingle field was crowded in the early 1980's and that the use of such jingles was going out of style. He also explained that "freshening" a jingle or ID library, by deleting old material and producing new material, is necessary *321 in order for a library to maintain its marketability. O'Connor listened to all the subject jingles and ID's prior to making his determination of value. He relied upon comparable sales in valuing the subject jingles and ID's. To do so, he looked to sales of advertising "production libraries" which occurred between 1982 and 1984. Advertising production libraries are similar to the subject jingle libraries because they each include generic jingles of a similar format. O'Connor relied particularly on his valuation of a library named "The Producer", which had outstanding success over a long period. This library consisted of 400 generic advertising jingles, as well as graphic and continuity materials, and instrumental music. In O'Connor's view, the jingles in "The Producer" library were more professionally produced and were of a higher quality than the subject jingles produced by RABI. In 1983, OCS bought "The Producer" for $ 200,000, or approximately $ 500 per jingle. O'Connor considered the market and his evaluation of "The Producer" in 1983 with as much care as he could since he was making the largest single investment his company ever has made. O'Connor reported that "The *322 Producer" has generated about $ 500,000 in license fees from radio and television stations but that virtually all of these sales are attributable to the instrumental music and sound effects in the library. He reported that few sales were achieved by the 400 generic jingles. O'Connor's report also described the Shamrock Broadcasting Company's sale of T.M. Company. By allocating prices to the assets contained in that sale, O'Connor demonstrated that the maximum value for the jingles involved would be $ 1,500 per jingle. He concluded that the $ 1,500 figure was the "absolute maximum" for the value of the subject jingles in this case. As an alternative method of valuing the jingles, O'Connor priced them according to their production costs, plus an appropriate profit margin. He determined, based upon his review of RABI's reputation in the industry at the time of production, and by listening to the subject jingles, that a profit margin of one-third of the production costs would be generous. O'Connor relied upon the records of his own company, as well as the experience of other producers of generic jingles to determine typical costs of production during 1982 and 1983. He further relied *323 upon production cost information supplied by Egan. He calculated that the cost of producing the subject jingles was $ 633.44 per jingle. Based upon this cost-plus-profit analysis, O'Connor determined the fair market value for a jingle, in 1982 through 1984, was $ 844. He added, "Further, a number of production houses would have produced and sold this product for this amount at this time." With respect to the ID's, O'Connor looked to current pricing information from the "buyout" of ID packages of similar content, and of equal or better quality than the subject ID's. A "buyout" is the acquisition of all rights to a piece of music in exchange for a one-time charge, leaving the buyer free of any obligation to pay royalties and other "residuals." In 1983, the offering price for a buyout of a 10-track ID package from the Steven Arnold Company, much better in quality than the subject ID's, would have been 10 percent less than the current (1990) price of $ 45,000 per package. O'Connor concluded that the fair market value of each of the subject ID's could not exceed $ 40,000. O'Connor also priced the ID's according to their production costs, plus an appropriate profit margin. He again *324 took into account RABI's reputation in the industry at the time of production, and the quality of the subject ID's. He again applied a profit margin of one-third of the production costs. O'Connor relied upon his own experience, as well as the experience of other producers, to determine typical ID production costs during 1982 and 1983. He also utilized information supplied by Egan. He determined that the cost of producing each of the subject ID's averaged $ 5,695. He concluded that the fair market value of each of the ID's in the same period, based upon the producer's cost plus a one-third profit markup, is $ 7,593. 2. Walt Woodward
Respondent also introduced the expert report and testimony of Walt Woodward (Woodward) as evidence with respect to the value of the subject jingles and ID's. Woodward was the president and founder of Perfect Pitch, Inc., a company which produced and marketed ID's, syndicated jingles, and custom jingles. He was senior vice president of a national advertising agency, a copywriter, a music director, and a broadcast producer. During the years 1982 through 1984, Woodward's Perfect Pitch wrote and produced more than 600 advertising jingles and *325 ID's for national, regional, and local accounts. Woodward has written a book, "An Insider's Guide to Advertising Music." The book was first published in 1982 and republished, with revisions, in 1985. Woodward listened to all of the subject jingles and ID's for purposes of preparing his valuation report and testimony. Woodward reported that neither Egan nor Crockett nor RABI had a significant "track record" in musical commercial advertising production and exploitation. He further concluded that the subject library had strengths and weaknesses, but was of average quality except in the areas of lyrics and vocal performance, which were below average in quality. Woodward noted that many jingles were very narrowly focused, usable only for specific holidays, promotions, or types of businesses. Some generic "image" jingles would have a broader appeal, but still only a "limited potential". Woodward further noted that the in-store jingle concept was unproven, that there were no established channels for distribution, and that the availability of only "a very nominal fee" from retailers would have been obvious to a prospective investor. Additionally, there was no provision for freshening *326 or updating the jingles or ID's -- a deficiency which would have lessened their economic value. Woodward noted that competition was intense in the commercial music field, and that competitors had the ability to adapt their music to a customer's tastes -- e.g., to produce a "country" version of a given jingle. Additionally, "The Audio I.D. libraries were more suitable for exploitation, though their conceptual format -- building an I.D. program around a theme song -- was a 'fad', which might limit their economic life and potential distribution." He further observed that the ID packages also faced stiff competition from established companies. In order to reach a dollar value for the subject jingles and ID's, Woodward applied some discounting factors to comparable sales. As comparable sales, Woodward used "buy out" sales of individual jingles, that is, of sales like those involved here, where the buyer had no continuing obligation to pay fees to the performers and others. He began with an average "per track" buyout at a comparable price of $ 4,000. To take into consideration variations of quality among the jingles at issue, he estimated that a prospective purchaser would discount *327 the sales price by 30 to 50 percent. He also reduced the value by 10 to 15 percent to reflect the lack of competitive bidding, which, had it existed with respect to the subject jingles, would have reduced the price. Another discount reflected savings induced by economies of scale in production, and he finally applied a discount of 5 percent to indicate that the partnerships did not secure copyright protection for the jingles. His final analysis was that the price per jingle of those here involved a range from the merely nominal to approximately $ 1,200. With respect to the ID's, Woodward concluded that a typical ID consisted of the equivalent of six musical "tracks." He therefore multiplied the fair market value of a comparable jingle times six to reflect the fact that a ID has more musical elements than a jingle. He discounted the resulting prices for the ID's upon the same bases as his jingle discounts. He determined, however, that the ID's were targeted to a relatively active and stable market. Accordingly, he reduced the "marketing risk" discount applied to the jingles by 15 percent. He ultimately determined a price of $ 8,391.60 per ID, based upon a "buyout" figure. *328 3. Timothy Finn
Respondent also presented the testimony of Timothy Finn (Finn), a vice president of J & W Seligman Valuation Corporation, whose primary activities include valuation and economic feasibility studies of closely held businesses. Finn rendered an expert opinion regarding the economic feasibility of the subject partnerships, disregarding any potential Federal tax benefits. He based his study on the jingle and ID purchase and lease agreements, the distribution agreements, private placement memoranda, subscription agreements, purchase and lease notes, and the stated marketing plans. For his analysis of economic feasibility, Finn examined the projected cash flows contained in the private placement memoranda with respect to the subject lessee partnerships. Because his copies of the Pacific and Station I.D. private placement memoranda did not reflect the properties actually acquired by those partnerships, he prepared projections that took into account the objectives of these partnerships, using very optimistic assumptions. For each lessee partnership, he concluded that, based upon these projections, the cash flows are insufficient to service and pay back any partnership *329 debt and still earn a positive return. Finn made his analyses under two separate hypotheses. In the first, he assumed that the lessee's general partners would distribute the projected earnings to the investors, rather than applying the earnings to debt service. Under these projections, the accumulated interest would exceed the total distributions, because of the unpaid interest. In the case of Pacific, for example, after 10 years the cash flow would amount to approximately $ 2,340,717, while the total debt would be $ 3,277,970. If the general partner instead used the cash flows to pay down the partnership debt, the partnership still would have total debt outstanding of $ 153,099 after 10 years. Finn also examined the lessor partnership Masterwork and determined that it was not an economically viable business as of its inception in 1982, because cash flows to be received from the lessees would be insufficient to service the partnership's debt and earn a profit. B. Petitioners' Experts
1. May Moseley and Ralph Arnold
Petitioners presented the expert valuation evidence of may Moseley (Moseley) and Ralph Arnold (Arnold), who presented integrated reports and testimony. *330 Moseley has been employed with three of the largest companies involved in the production of commercial jingle libraries: TM Productions, First Comm Broadcasting Services, and Otis Connor companies. She has worked in a variety of positions, including sales coordinator, production coordinator, director of marketing, and operations manager for these companies. Moseley made an income projection approach to valuing the subject assets. Under this approach, the fair market value of each jingle or ID is based upon the income it is assumed to generate. She first noted that the jingles were, "on the whole, very high quality productions of national caliber." As for the ID's, the "quality of the station ID packages varies but they are all of readily marketable quality in multiple markets". Moseley commenced her valuation by considering the gross total face amount of the purchase price of the jingles and ID's, including both cash and nonrecourse notes, as a significant factor in determining value. She explained that she considered the face amount of the price important because "the two parties involved in no way had any relationship to each other". Moseley considered the earning potential *331 as of 1982 of the subject jingles under three complementary methods of marketing -- as components of jingle libraries, as syndicated jingles, and finally as components of in-store broadcasting. She explained that jingle libraries are groups of jingles that are marketed as a whole -- for example, a production company may lease a jingle library to a radio station. The radio station then would have an inventory of jingles for sale of advertising to its customers. "Syndicated" jingles are considered singly. They are directed at a particular type of advertiser, such as an advertiser in the automobile industry, or one in the grocery business. Once sold, they may be individualized or "customized" by singing or speaking the advertiser's name as part of the jingle. Finally, jingles used as in-store broadcasting are just that, jingles broadcast over a given store's sound system, directing the customers to particular products or services. Moseley considered projections of potential income from jingles prepared by Egan before producing the jingles here in issue. She also relied upon rate information which Egan assembled by calling jingle companies and upon rate cards she already had as *332 well as upon her own experience in the business. Viewing the jingles for their value as components of jingle libraries, she concluded that the jingles would bring in $ 588,000 per library, or a net of $ 11,760 per jingle. From sales of "syndicated" jingles she assumed an additional income stream for each of the same jingles of a net $ 29,750 per jingle. Because she had little background with in-store advertising, however, she relied upon figures supplied to her by RABI, as to actual net earnings experience for jingles for later years, 1987 through 1989. In fact, because of her difficulties with mathematics, she relied upon Arnold to handle the figures and had modest participation in the valuation with respect to in-store advertising. From these figures she projected 12-year total earnings per jingle of $ 55,318. Petitioners then gave Moseley's income figures to Arnold, a valuations expert, who determined a present value from the income streams anticipated by Moseley. Arnold discounted Moseley's income projections to arrive at a 1982-1984 value of $ 38,841 per jingle. This was the sum of the discounted value of $ 6,583 per jingle as part of a jingle library, a discounted value *333 of $ 21,357 per jingle as a "syndicated" jingle, and of $ 10,901 per jingle as a component of "in-store" advertising. In addition to deriving these final figures, Arnold analyzed income projections made by Egan when the subject jingles were sold. He reached an approximately equivalent current value of $ 39,230 for each jingle. Arnold also discounted the notes executed by the partnerships to come up with a present value analysis of $ 32,000 per jingle. With respect to the ID's, Moseley utilized essentially the same approach. She calculated total earnings of $ 235,860 per ID. She assumed that there would be 20 sales of each ID to radio broadcast stations plus 10 sales to television stations over a 3-year period. When Arnold applied his present-value determination, he achieved a value of $ 154,559. Moseley added anticipated in-store earnings from the station ID's over a 12-year period in the amount of $ 306,330. These were again based upon projections RABI supplied, but which she found reasonable. Arnold calculated the present value of her in-store ID earnings figure as $ 60,367. He added his two discounted figures to yield a final result, as of 1982, of $ 214,926 per ID. *334 Based upon her past experience in the industry, however, Moseley believed that this figure was excessive. She accordingly concluded that the fair market value for each of the ID's on the date of the purchase by the partnerships should be reduced to $ 150,000. ULTIMATE FINDINGS OF FACT 1. The fair market value of each of the subject jingles is no more than $ 2,000, and the fair market value of each of the subject ID's is no more than $ 10,000. 2. Neither RABI nor the lessor partnerships intended to or were able to enforce the long-term notes received in the sale and leasing transactions at issue. 3. The persons who managed the affairs of the partnerships at issue did not have a business purpose in entering into or conducting the transactions at issue. 4. The transactions involving the sale and leasing of the jingles and ID's at issue lacked economic substance. OPINION The initial question for consideration here is whether the transactions at issue were shams and thus lacked effect for tax purposes. I. The Sham Transaction Analysis
In general, a transaction will not be considered a sham where there is a genuine multiple party transaction with economic substance which *335 is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached. When, however, taxpayers resort to the expedient of drawing up documents to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits, the particular form they employ is disregarded for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 572 (1978). The parties to such a transaction may, for example, enter into binding contracts. If their goal in doing so is not part of the conduct of a profit-making enterprise, their transaction will be disregarded as a sham "though all the proceedings have their usual effect." Helvering v. Gregory, 69 F.2d 809, 811 (2d Cir. 1934), affd. 293 U.S. 465 (1935). In general, petitioners bear the burden of proving that they are entitled to the claimed deductions. Rule 142(a). Where respondent determines that a purported business transaction is a sham, the taxpayers must show *336 that they had a business purpose for engaging in the transaction other than tax avoidance, and that the transaction had economic substance beyond the creation of tax benefits. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628; Shriver v. Commissioner, 899 F.2d 724, 727 (8th Cir. 1990), affg. T.C. Memo. 1987-627. [4]
*337 The test we apply generally entails "both the taxpayers' subjective business motivation and the objective economic substance of the transactions". Casebeer v. Commissioner, 909 F.2d at 1363. "The consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses." Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. 85 T.C. 968 (1985). II. The Transaction Lacks Business Purpose
A. The Business Purpose Test
The "subjective business motivation" test involves the consideration whether a taxpayer had an "actual and honest profit objective" in engaging in the transactions at issue. Rose v. Commissioner, 88 T.C. 386, 411 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976); see also Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963), *338 affg. T.C. Memo. 1961-256. A determination of profit objective can be made with reference to the actions of those individuals who manage the affairs of the partnership. Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner, 734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, 734 F.2d 5 (3d Cir. 1984). B. The Controlling Facts in this Case
The controlling facts in this case are the actual payments and the activities which took place and the benefits which were conferred as a result of such payments. In short, the outcome of this *339 case is controlled by what really happened. Again, in sum, the lessor partnerships negotiated with RABI for the production of jingles and ID's. RABI demanded and received cash payments of $ 2,000 per jingle and $ 10,000 per ID, sufficient to cover RABI's costs plus a profit. O'Murphy arranged for the price to be inflated by the payment of notes which were in effect nonrecourse. The lessor partnerships leased the jingles and ID's to the lessee partnerships at prices which reflected the inflated valuations and received from the lessees cash payments to satisfy the obligations to RABI plus large nonrecourse notes. The claims for substantial investment credits and depreciation deductions were allocated to the lessee partnerships. The lessor partnerships are flow-through entities, although some cash has been taken by general partners. Pursuant to agreement, RABI made an effort to market the jingles and ID's commensurate with the cash payments, paid little to the partnerships, and maintained control of the jingles and ID's through its holding of the substantial indebtedness of the partnerships, secured by the jingles and ID's. The net result of the plan is that the limited partners *340 of the lessee partnerships furnished the necessary cash and received reimbursement and potential profit only in the form of tax benefits. For them the transaction was about a 3.0 to 1 tax shelter arranged so that they never were substantially out of pocket. RABI was enabled to produce jingles and ID's at no cost to itself and even at a small profit just from the production activity. Thereafter, it effectively controlled the jingles and ID's and paid the partnership-owners only a small amount of cash to cover legal fees. When current contractual arrangements expire, RABI will have the option of foreclosing on the notes secured by the jingles and ID's, or continuing to use the jingles at a renegotiated lower price, or simply abandoning petitioners' partnerships and leasing other more modern products for use in its in-store advertising business. Partly as a result of the transactions here, RABI has built an in-store advertising business, but petitioners have no interest in that business. Petitioners never have received any profit from the ventures in issue, and because of the very limited value of the jingles and ID's in question, they never will receive any economic profit. C. *341 The Inflated Purchase Price of the Jingles and ID's
Our analysis of the issue in this case requires us to find whether the purchase prices charged for the jingles and ID's exceeded their fair market values. The Ninth Circuit has described an inflated purchase price as "Perhaps the most important single factor suggesting that the actual motive for the * * * activities was tax avoidance rather than even speculative profit". Independent Electric Supply, Inc. v. Commissioner, 781 F.2d 724, 728 (9th Cir. 1986), affg. T.C. Memo. 1984-472. The standard for measuring fair market value is the price at which the property would change hands between a hypothetical willing buyer and a hypothetical willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973). Fair market value is inherently a question of fact to be resolved by weighing all the relevant evidence in the record and drawing appropriate inferences therefrom. Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987). *342 1. Negotiations
We have found that the fair market value of each of the jingles involved in this case was not more than $ 2,000 and the fair market value of each of the subject ID's was no more than $ 10,000. We base these findings upon the cash that the lessor partnerships paid RABI. Where sales of the property to be valued have been made at or about a crucial date, they are preferred as evidence of value rather than opinion. Andrews v. Commissioner, 38 F.2d 55 (2d Cir. 1930), affg. 13 B.T.A. 651 (1928); Flynn v. Commissioner, 35 B.T.A. 1064 (1937); Walker v. Commissioner, T.C. Memo. 1982-495, (citing Tripp v. Commissioner, T.C. Memo. 1963-244, affd. 337 F.2d 432 (7th Cir. 1964)); see Narver v. Commissioner, 75 T.C. 53, 97 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Here, all indications are that Egan and Crockett engaged in arm's-length negotiations with O'Murphy about the cash he would pay. At the prices agreed upon, the 500-odd *343 jingles and additional ID's required O'Murphy to come up with more than $ 1 million in cash and short-term notes. A deal for this much in cash or cash equivalents normally would result from active negotiations. Moreover, these cash figures are consistent with prices Egan had earlier set for the First Choice library. There, Egan proposed, "The [150-jingle] library must be purchased in toto for a cost of $ 289,000.00". The proposal required an additional $ 39,000 to add "station ID's" in the form of "three discs". These demands amount to a per jingle price of $ 1,926; the three ID's were priced at $ 13,000 each -- figures that are close to the values we have determined for the subject jingles and ID's. Our findings of fair market value ignore the long-term notes that the purchasing partnerships gave to RABI. RABI did not intend to collect those notes, and the documentation and other facts and circumstances of this case demonstrate that they were and are uncollectible. Such notes represent an unrealistic puffing of price and are irrelevant to our finding of the value of the items purchased. 2. Expert Opinions
The testimony and report of respondent's expert Harry O'Connor *344 substantiates our findings of value. O'Connor's past experience in the industry, especially his involvement with program features, commercial production, jingle production and marketing, and ID's is impressive. His actual purchase of "The Producer" for his own company for $ 200,000 in 1983 and his detailed personal knowledge of the value of the components of that library involved a market place experience unmatched by other experts. We found him to be forthright, candid, authoritative, and credible. We have relied heavily on his valuable report and testimony. Based upon the sale of other jingle libraries, O'Connor concluded that $ 1,500 was the "absolute maximum" ceiling for the value of the subject jingles in this case. Addressing the specific qualities of the jingles here involved, O'Connor concluded that they were well-written, performed and recorded. In sum, they were "good, but not unique." He testified, however, that "there are libraries with a large quantity of jingles of a similar nature that are sold very, very inexpensively * * * there are probably twenty around, very reasonably priced material of a comparable nature." O'Connor also noted that he had been offered *345 ownership of other libraries produced by other companies, but that his appraisal showed that the prices asked did not justify the effort needed to market them. In his view "The profit wasn't there." O'Connor's comparable values for the jingles were based upon already marketed items. As his own experience shows, a jingle library will continue to sell after it has been marketed in other areas. We believe, however, that the fact that the subject jingles were new may add to their value. O'Connor determined a maximum value of $ 1,500 per jingle, and we consider it entirely possible that O'Murphy, lacking O'Connor's expertise in the industry, simply overpaid for the jingles. Nevertheless, in deference to the significance of actual cash payments and because the difference in dollars is relatively modest, we accept the $ 2,000 cash amount paid to RABI as the fair market value of the subject jingles. O'Connor established a top limit of $ 40,000 for ID's based upon prices offered by an established producer of superior ID's. He noted, however, that successful marketing of the subject ID's would require major efforts, with direct mail, trade advertisements, editorial material, direct selling, *346 and travel. To hold their own with the other material on the market, these ID's would have to "compete on the same level with the same marketing expertise, and the same variety of material offered." RABI lacked that expertise. Because RABI lacked the marketing capacity to compete with established producers and did not have products as good as those with which O'Connor was making comparisons, we find more convincing O'Connor's alternative cost-plus-profit method of valuing the ID's. His determination of the ID's value, based upon their costs to produce plus a one-third markup, is that each ID was worth $ 7,593. He testified, however, to the possibility of a somewhat higher range. We accordingly do not find his testimony inconsistent with our fair market value finding of $ 10,000 per ID, based upon the amounts paid to RABI. Respondent also offered the report and testimony of Walt Woodward, the president of his own advertising agency, and the former president of Perfect Pitch, Inc., a musical advertising agency. Woodward's evidence supports O'Connor's conclusions. To arrive at a value for the subject "generic" jingles -- that is, for jingles that could be adapted for use by a *347 variety of advertisers -- Woodward looked to prices charged to advertising agencies by his own company for customized jingles. He discounted those prices to reach a value for the jingles at issue. Initially, he discounted the jingles by a factor of 30 to 50 percent, to take into account variations in their quality. He also discounted them by another 10 to 15 percent to reflect that they had not been customized for the specific advertiser who would be using them. An additional 10 to 15 percent discount reflected that the jingles were not copyrighted. Woodward ultimately arrived at a value of about $ 1,200 per jingle. He valued the ID's by multiplying the values of the jingles times six, reflecting the number of tracks he found in the average ID's. He then discounted that value on the same basis as the jingles. He noted, however, that the ID's, unlike the subject jingles, were not highly restricted in terms of their subject matter and content. Because of this, Woodward applied less of a discount than he had used for the jingles. He arrived at an overall value per ID of $ 8,391.60. Woodward made some of his determinations on a "per-track" basis -- that is, he determined the *348 prices of the comparable jingles based upon the average prices charged to advertising agencies for each of the sound "tracks" his company sold. But, on cross-examination, Woodward conceded that he may have attributed too many tracks to a given transaction. For example, if he had assumed that one of his advertising agency customers had paid $ 9,000 in a transaction for two jingle tracks, but in fact the agency had paid $ 9,000 for one track, then the average price per track -- and, hence, Woodward's average price per jingle -- would have been higher than indicated in his report. In this example, the comparable jingle track would cost $ 9,000, not $ 4,500. Accordingly, even after application of the discounting factors, a higher beginning cost for the comparable jingle would have resulted in a higher valuation of the subject jingles. Moreover, when asked at trial for documentation that would substantiate the number of tracks purchased in a given comparable transaction, Woodward was unable, in some instances, to produce such documentation. These shortcomings, while troubling, are not fatal. "Suffice it to say that even if * * * [the expert] committed some errors in his *349 analysis, none of the errors would be enough to explain the * * * purchase price paid by the limited partnerships." Beck v. Commissioner, 74 T.C. 1534, 1558 (1980), affd. 678 F.2d 818 (9th Cir. 1982). Woodward's approach, and the discounts he employed, are appropriate. He did have the difficulties in determining comparable "tracks" and in demonstrating the specifics upon which he based some of his figures. Woodward explained his difficulties by reference to filing and moving mechanics and similar matters, but our confidence in his report and testimony was reduced by the problems which became apparent upon cross-examination. Accordingly, we believe that it is appropriate to modify his valuations in favor of the higher per jingle and per ID valuation suggested by the cash value of RABI's sales to the lessor partnerships. Respondent's expert Finn prepared detailed analyses of cash flows and accumulated indebtedness of the partnerships. His analysis showed that the partnerships were still in a loss position after 10 years of operation. No reasonable profit-motivated person would have invested based upon the figures that such *350 an analysis would yield. See Soriano v. Commissioner, 90 T.C. 44, 56-57 (1988). Petitioners have not produced evidence to counter Finn's analyses. Instead, in their reply brief, they have constructed an elaborate hypothetical which involves substituting their own selected figures into Finn's analysis and treating adjustments to nonrecourse loans the same as cash payments. Their hypothetical also makes the unrealistic assumption that the jingles and ID's will retain enough value over the years as collateral to satisfy fully each lessee's multi-million dollar debt when the jingles and ID's are surrendered to RABI. Having gone through these maneuvers, petitioners demonstrate a positive cash flow. Petitioners' use of alternative figures fails to undercut the apparent validity of Finn's original computations. [5]
*351 We do not agree with the valuations produced by petitioners' expert May Moseley. She is knowledgeable in the jingle and advertising music areas generally, but her valuation method is wholly unsuited to the jingles and ID's at issue. Rather than look to comparable sales of jingles, Moseley instead used an income approach. That is, she attempted to value the jingles in terms of the income each would presumably generate. She arrived at figures of approximately $ 38,800 for each subject jingle and $ 150,000 for each ID. Moseley commenced her valuation with the assumption that the gross pricing claimed by petitioner was arrived at by bargaining between unrelated parties. She would accept the nonrecourse notes given by the lessor partnership at full face value. We do not consider this view realistic. In her calculations Moseley has assumed a utopian performance for each of the subject jingles. Unlike O'Connor or Woodward, she has failed to take into account the existence of established jingle producers who would provide stiff competition for each of the jingles. Nor did she otherwise justify her conclusion that the subject jingles and ID's would be worth many times the values *352 of those being marketed by other production houses. In estimating sales she simply took as gospel the projections Egan had prepared before producing the jingles -- essentially as a sales tool. She failed to take into account RABI's lack of marketing resources and marketing experience. In her report, Moseley stressed the necessity of aggressive and effective marketing to the success of the jingles. Moseley states, "To a large extent, the value of a jingle or ID depends upon the efforts made to market the jingle. The more aggressive the marketing plan, the more revenue the jingle or ID will likely generate, and therefore the more value it will have to the owner." She proceeded to value the jingles as if they had been successfully marketed in three distinct categories: as syndicated jingles, as components of a conventional jingle library used by radio and TV broadcasters, and as components of in-store point-of-purchase advertising. Notwithstanding Moseley's stress upon the need for adequate, if not outstanding, marketing, she showed no basis for assuming that RABI, as the distributor, had the potential to do any effective marketing whatsoever. As to her first category of sales, *353 there was no attempt made to sell the jingles as individual syndicated jingles. As to the second category, RABI made no serious attempt to market jingle libraries as separate assets to radio and television stations. With respect to the ID's, RABI did incorporate some of the ID material into its long-form radio programming, with insignificant results. RABI earlier had marketed its "First Choice" library but there is no evidence in the record to show that RABI's barter-time sales were a success. As to Moseley's third category, RABI's only success came in the serendipitous in-store business. RABI's initial move was only to hire Schearrer, who talked to a few retailers about in-store advertising. Then came the Safeway deal. But the Safeway deal, involving in-store advertising, was not as successful as Moseley supposes. She concedes that she is unfamiliar with in-store advertising. She has therefore accepted at face value RABI's reports of in-store revenues for the years 1987 through 1989. Because she has done so, her estimates are seriously flawed. RABI's income figures are based upon the payment to the partnerships of $ 50 per store in advertising revenues per month. In actuality, *354 the jingles only yielded $ 5 per month. The $ 45 balance existed only in the form of RABI's meaningless journal entries, as "credits" against notes that RABI did not intend to collect. Egan's testimony indicates that RABI would not pay $ 50 per store per month unless he could make that payment as credits against the notes. We are satisfied that, in the jingle industry, payment of $ 5 per store per month for a jingle library is a handsome rental; the payment of $ 50, in cash, is just not done. Thus, Moseley's estimates overstated by a factor of at least 10 the income attributable to the in-store business -- the only viable part of the jingle marketing effort. Petitioners argue that the jingles and ID's here at issue are "intellectual property", and that Moseley's "income" approach is the best guide to value such intellectual property. They argue that O'Connor's and Woodward's comparable sales are inappropriate. We disagree. Notwithstanding the intellectual content of the jingles and ID's, both the partnerships and the industry treated "generic" jingles and ID's as essentially commodity products. A market for such jingles and ID's exists. Here, that market shows a much lower *355 value for the jingles and ID's than petitioners' "income approach" indicates. In doing so, the market takes into account the substantial experienced competition that would bring petitioners' utopian "income approach" values to a more reasonable level. Petitioners offered the report and testimony of Ralph Arnold to supplement May Moseley's evidence. Arnold testified as an expert appraiser with no background in the music or jingle business. Because Moseley disclaimed any mathematical talent, she relied upon Arnold to discount her income projections to current value. The discounting proved misleading and had to be revised at trial. Nevertheless, we consider Moseley's projections exaggerated and useless. Arnold's discounting which commences with Moseley's projections and prospective income data furnished by Egan produces only exaggerated and unrealistic current values based on similarly erroneous projections. Petitioners made no serious effort to defend the claimed value of the Jimmy Osmond "Hot Shot" album. It was worth no more than $ 35,000, the amount of cash RABI got for it, notwithstanding its later recited price of $ 1,617,000 and claimed annual rental fee of $ 149,725. *356 Our findings of fair market values are plainly inconsistent with the prices petitioners and their associates claim to have paid for the jingles and ID's in issue. People with actual and honest profit objectives simply do not pay 19 or 20 times fair market value for assets with ascertainable values. The same fair market value findings show a lack of business purpose at the lessor-lessee levels, as well. Here, the lessees agreed to pay $ 9,000 per year for each jingle, an amount which is more than four-and-one-half times the total value of each jingle leased. With respect to the ID's, the lessee partnerships agreed to pay an annual lease of $ 65,000 to the lessors -- more than six times the fair market value of the ID's. This evidence plainly demonstrates indifference towards economic profit. Soriano v. Commissioner, 90 T.C. 44, 56-57 (1988); see Provizer v. Commissioner, T.C. Memo. 1992-177, on appeal (6th Cir., June 26, 1992). D. Additional Circumstances
Our doubts about the profit motives of the jingle-ID partnerships are reinforced by the general partners' pervasive ignorance of the jingles industry. Sutton v. Commissioner, 84 T.C. 210, 244 (1985), *357 affd. per curiam 788 F.2d 695 (11th Cir. 1986), affd. sub nom. Knowlton v. Commissioner, 791 F.2d 1506 (11th Cir. 1986). Neither Charles Whiteley nor Sondra Dahl, the general partners of the lessor partnerships, had any knowledge of the commercial music industry in which their partnerships allegedly had invested several millions of dollars. Nor did any of the general partners of the lessee partnerships have any knowledge of the commercial music industry. Three of them, Johnson, Colwill, and Elsworth, are in the business of selling tax shelters, not renting jingles. The others, Henning, Dahl, Davidson and Essley, had some type of business or personal connection to O'Murphy, but no knowledge of jingles or ID's. Despite their ignorance of the jingles or ID business, none of the principals indicated any credible attempt to obtain independent economic information about the industry. The individual general partners of the lessors and lessees made only cursory visits to the Osmond recording studios; there they listened to Egan's general optimism as he tried to sell them on buying his products. As this Court has stated: Petitioners *358 are all sophisticated businessmen. We simply do not believe that they would enter into profit-motivated transactions with an unknown party and rely solely on the representations of such party with respect to the most crucial aspect affecting the viability of the proposed venture. Only the promised * * * tax deduction can adequately explain petitioners' entry into the * * * program under such circumstances. * * *
Patin v. Commissioner, 88 T.C. 1086, 1119 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Helba v. Commissioner, 87 T.C. 983, 1009-1011 (1986), supplemented by T.C. Memo. 1987-529, affd. without published opinion 860 F.2d 1075 (3d Cir. 1988). Egan prepared "pro formas" of projected *359 income from the jingles. The general partners allegedly relied upon these projections, despite the plain fact that neither Egan, nor, for that matter, Crockett, nor Merrill Osmond, had any demonstrated success in marketing their jingles or ID's. Those individuals were producers, with no track record of selling their products at a profit. The general partners knew that such income pro formas are to be viewed with skepticism. Robert Davidson, general partner of Assured, explained, "I have never seen a pro forma that didn't look good. * * * It's supposed to look good to you, your banker, your accountant, and so on." Petitioners' reliance upon Egan's guesses about possible future income, in preference to realistic evaluations and the real facts of this case, fundamentally flaws their valuations and arguments. Additionally, after the sales were made, RABI supplied some appraisals. These were written by past or present RABI employees and were unconvincing. Ferri's jingle appraisals are mass-produced and superficial. Trauth's appraisals of the ID's or, in his words, of each "superb quality station identification and image package" are little more than puff pieces, which resemble *360 advertisements for the products more than candid appraisals of their worth. Petitioners called neither Trauth nor Ferri to testify in this case. Another telling factor in making profit-objective determinations is the presence, or absence, of arm's-length negotiations. Flowers v. Commissioner, 80 T.C. 914, 934 (1983). In these cases, O'Murphy alone set the claimed prices. His nominal prices -- $ 38,900 for each jingle and $ 280,000 for each ID -- bore no resemblance to the fair market value of the jingles or ID's. Instead, he "backed into" those prices in order to substantiate the total tax benefits he needed to sell the tax shelters. The lessor partnerships nevertheless bought the jingles and ID's at those prices, without hesitation. Likewise, the lessee partnerships unblinkingly agreed to pay annual rentals -- $ 9,000 per jingle and $ 65,000 per ID -- amounting to several times the value of the jingles and ID's they were renting. The only parts of the deal that were based on any negotiation were the relatively insignificant cash down payments to RABI of $ 2,000 per jingle and $ 10,000 per ID. It is the full amount of the purchase prices and *361 rentals, however -- that is, the total amount of the cash paid plus the huge amounts of the promissory notes -- that determines the extent of the proffered tax benefits. Here, as in Fox v. Commissioner, 80 T.C. 972, 1010 (1983): The record is devoid of evidence showing that the purchase price * * * was in any way determined with "True regard for the profitability of the activity." * * * The negotiations were conducted only with a view toward benefiting both the promoters (in cash) and potential limited partners (in tax benefits). * * * [Citations omitted.]
Nor are petitioners aided by the record of consistent and substantial losses reported by the lessor and lessee partnerships. "A record of such large losses over so many years is persuasive evidence that petitioner did not expect to make a profit." Golanty v. Commissioner, 72 T.C. 411, 427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Between their beginnings and the year 1987, five of the lessee partnerships had accumulated total principal and interest obligations of $ 9,414,489. [6] Their sole source of income, *362 the RABI/BI license agreements, has paid cash of $ 90,068 plus credits against the notes of $ 879,724. Yet as we have found, the credits are, at best, illusory income -- they are credits given by RABI against notes that RABI considers uncollectible. As such, the "credits" themselves have no value. Additionally, the source of the limited amount of actual cash threatens to dry up in the near future. After 1993, RABI/BI is under no obligation to continue to pay these amounts to the lessee partnerships. Indeed, if the lessor partnerships default on their note obligations -- and Masterwork's accumulated debts of $ 7,420,266 make such a default seem likely -- RABI/BI contemplates repossessing the jingles for subsequent use in an intercompany arrangement providing for a rental of $ 1 per year. The partnerships' history of cash expenditures further diminishes notions of their business motivation. The cash flowing out *363 of the lessee partnerships is not consistent with a profit-oriented business. Here, the private placement memoranda show that the promoters of the jingles and ID's stood to profit handsomely, regardless of the economic success of their businesses. Actual practice confirmed these predictions. To the extent they are available, records of the jingle partnerships -- of the lessees Pacific, Audio, Assured, and Advanced, and of the lessor Masterwork -- indicate that a significant portion of the capital raised from the sale of limited partnership units was ultimately paid to O'Murphy or to his foundations, and to some of the lessor and lessee general partners. Additionally, offering materials that focus on tax benefits and do not provide a sound basis for profitable operations are indicative of a lack of profit objective. A related consideration is the promoters' considerable experience in structuring tax shelters. Beck v. Commissioner, 85 T.C. 557, 571 (1985); Seaman v. Commissioner, 84 T.C. 564, 589 (1985). In the present cases, the offering materials include varying mixes of tax write-off projections, lengthy tax opinions *364 from O'Murphy's office, and promises of legal defense funds to stave off respondent's expected challenge to the tax deductions. Moreover, O'Murphy, Miller, and a number of the individual general partners have extensive backgrounds in tax shelters. The promoters and general partners of these partnerships uniformly claim that they were primarily motivated by the profits offered by marketing RABI's jingles and ID's. They point not only to established markets, but also to the possibility of new low-power television and in-store markets. In determining the existence of a profit objective, however, we give greater weight to objective facts than to a taxpayer's statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Each of the promoters and partners knew enough to stress at trial their personal hopes of great profits. The objective facts, however, show that these prospects for profit were nonexistent. Taking into account the relevant factors, we conclude that the partnerships involved did not enter into the transactions at issue with an *365 actual and honest intention of making a profit. III. The Transactions Lack Economic Substance
The same factors that demonstrate petitioners' lack of a profit objective also convince us that, objectively, the jingle and ID programs lacked economic substance -- that is, the jingles and ID's lacked any profit-making potential and existed only to generate tax benefits. The economic substance test is based on objective factors which indicate whether the taxpayer had a reasonable opportunity for economic success. In Levy v. Commissioner, 91 T.C. 838, 856 (1988), we found the following factors to be particularly important: The presence or absence of arm's-length price negotiations, Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. 860 F.2d 1075 (3d Cir. 1988); the relationship between the sales price and fair market value, Zirker v. Commissioner, 87 T.C. 970, 976 (1986); the structure of the financing, Helba v. Commissioner, supra at 1007-1011; the degree of adherence to contractual terms, id.; and the reasonableness *366 of the income projections, Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 204-207 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). As we stated in Rose v. Commissioner, 88 T.C. 386, 414 (1987), affd. 868 F.2d 851 (6th Cir. 1989), applications of the "subjective" profit test share many common characteristics with applications of the "objective" test of economic substance; see McCrary v. Commissioner, 92 T.C. 827, 844 (1989); cf. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628; Sochin v. Commissioner, 843 F.2d at 354. We already have discussed many of these common characteristics in our consideration of business purposes. Those considerations apply with equal force to our conclusion that the transactions at issue lacked "any practical economic effects other than the creation of tax losses." Sochin v. Commissioner, 843 F.2d at 354. An additional factor *367 in evaluating economic substance, and one upon which the parties place great emphasis, is the structure of the financing. The presence of deferred debt that is not likely to be paid is an indication of lack of economic substance. Knetsch v. United States, 364 U.S. 361 (1960); Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542, 552-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Therefore, where a transaction is not conducted at arm's length by two economically self-interested parties, or where a transaction is based upon "peculiar circumstances" which influence a purchaser to agree to a price in excess of the property's fair market value, we have disregarded indebtedness to the extent it exceeded the fair market value of the purchased assets. See, e.g., Bryant v. Commissioner, 790 F.2d 1463, 1466 (9th Cir. 1986), affg. Webber v. Commissioner, T.C. Memo. 1983-633; Odend'hal v. Commissioner, 80 T.C. 588, 604 (1983), *368 affd. and remanded 748 F.2d 908 (4th Cir. 1984); Lemmen v. Commissioner, 77 T.C. 1326, 1348 (1981); Roe v. Commissioner, T.C. Memo. 1986-510, affd. without published opinion sub nom. Sincleair v. Commissioner, 841 F.2d 394 (5th Cir. 1988). We examine the substance of such debt and are not guided solely by its form. Waddell v. Commissioner, supra.
We have therefore often refused to give effect to instruments which appear on their face to be recourse notes, but which were unlikely ever to be enforced because of the circumstances surrounding them. See, e.g., Waddell v. Commissioner, supra; Patin v. Commissioner, 88 T.C. at 1122-1124 (1987); Helba v. Commissioner, 87 T.C. 983, 1009-1011 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); Houchins v. Commissioner, 79 T.C. 570, 599-603 (1982). Other instances in which we have refused to give effect to allegedly *369 recourse notes in similar tax-shelter situations occur, for example, in Fritz v. Commissioner, T.C. Memo. 1991-176; Maultsby v. Commissioner, T.C. Memo. 1989-659; Diego Investors IV v. Commissioner, T.C. Memo. 1989-630. Our examination of the financial structure of the jingle-ID partnerships shows, initially, that the structure of the financing is unprecedented in the commercial music industry. Even respondent's expert May Moseley conceded that, "because of the unique nature of these transactions, the task of determining fair market value is particularly difficult." In the jingle industry, a lessor or licensor does not take long-term notes as consideration for the lease of a jingle. Moreover, there was no independent third party lender; the lessors' notes were instead given as purchase money notes to the seller, RABI. And RABI, as we have already noted, having received the cash payments it sought "would have no reason to object to such artificial inflation of the purchase price." Flowers v. Commissioner, 80 T.C. 914, 935 n.28 (1983). In fact RABI, the putative *370 lender, was not an independent unrelated third party but was an essential element of the tax shelter team. The notes were needed to provide part of the predicate for the promised tax deductions. In this regard, we do not believe that RABI ever hoped to collect the long-term notes. To RABI, the notes were essentially nonrecourse, that is, the only thing RABI would seek on foreclosure is a return of the jingle and ID's themselves. RABI did not intend to collect cash on foreclosure. Importantly, RABI, as creditor, failed to investigate the creditworthiness of the lessors who executed the notes. Egan explained: I didn't know who those people were or the nature of the structure of their investment relationship. I wouldn't have known at the time of the product sale the relationship between the lessees and the lessors, or the particulars of their arrangement. We only knew that what we sold, and we only knew that the contracts that we had provided for the preservation of the rights we were interested in, the product, on an ongoing basis.
RABI's lack of interest in enforcing the notes is further reflected in its failure to include the notes in its list of assets, because of *371 "concerns about their collectibility." Egan and Crockett, in RABI/BI's SEC registration statements, have also reflected their "belief that the notes would not be collected", or, later, their "doubt that the notes would be collected". The purchase agreements all specified that upon default by the lessors, RABI would repossess the jingles and ID's. The agreements also contained language whereby, in the event of such repossession from the lessors, RABI would nevertheless agree to pass the investment tax credits through to the lessee partnerships. These factors strongly indicate that, in the event of default, RABI will look to recover only the jingles themselves; it will not attempt to collect additional monies owing from the partnerships. The fact that the lessors had little reason to worry about RABI's collecting its notes demonstrates that the lessors, in turn, had little reason to institute actions against the lessees for the lease notes, or against the limited partners for their assumptions of the lessees' liability on those notes. Indeed, Whiteley, the general partner of the lessor Masterwork conceded that, in paying their notes, "The limited partners have fallen short." When *372 the Court asked whether Whiteley had considered bringing an action against the limited partners for the money owing, Whiteley replied: No way. I'm not going to bring an action against them. I'm going to sit down and work out with them things that are acceptable to me * * * And I want to cooperate the maximum extent that I have any room to cooperate, as long as I have room to maneuver with [RABI]. It is totally counterproductive and in none of our interest to get into lawsuits against each other.
These factors show that once again, "In the instant case, we are convinced, as stated above, that the purportedly recourse * * * notes served merely as a facade for the support of the tax benefits promised the investors * * *. The possibility that the notes would be repaid was illusory." Farrell v. Commissioner, 90 T.C. 1154, 1186 (1988). Because these notes were unlikely to be paid, they lacked the "stuff of substance" required to be given effect for tax purposes. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975). The ability of the obligor *373 to make the loan payments required by the financial structure of a transaction is a related factor in evaluating a transaction's economic substance. See, e.g., Frank Lyon Co. v. United States, 435 U.S. 561, 582 n. 17 (1978); see also Burns v. Commissioner, 78 T.C. 185, 212 (1982). Here, the lessor Masterwork and the lessee partnerships shared the common characteristic of being undercapitalized. Charles Whiteley may have had a net worth of approximately $ 1 million, but the Masterwork partnership took on debts of $ 7.5 million. Moreover, petitioners concede that he is insulated from liabilities for the purchase price of the ID's. As to the limited partners, petitioners have failed to prove that Masterwork Leasing, Ltd., the corporate general partner of the Masterwork partnership, had any assets other than the seemingly meaningless $ 600,000 note it took from Gawain. Gawain, in turn, had no assets with which to pay its note other than the interest in the Masterwork partnership. Neither general partner could pay the liabilities. The general partners of the lessor Cameo had even fewer assets. At the lessee level, all *374 of the lessees' individual general partners are insulated from liability on the lease notes by the express terms of the notes. Moreover, petitioners have failed to prove that any of the corporate general partners of the lessees has the assets needed to pay off the partnership liabilities. In most cases, the corporate general partners were funded with the investment of only a note or cash amounting to a few hundred dollars. No independent third-party lender would have extended millions of dollars of credit to such impecunious borrowers. Finally, although the lessees' limited partners have executed "assumptions" of their partnership's note liabilities, no one has enforced these assumptions. In any event, these assumptions amount to only a small fraction of the partnerships' liabilities on the notes that have accrued in the years following the leases of the jingles and IDs. These assumptions therefore fall far short of providing a means to pay off the partnerships' notes. They are thus too meager to confer economic substance upon the subject partnerships. Our overall analysis of the jingle and ID transactions reveals a lack of a genuine opportunity for the partnerships to have *375 any economic success. We therefore conclude that the sale and leasing transactions before us lack economic substance. Because of the lack of an actual and honest profit objective, as well as the lack of economic substance, these jingles and ID transactions are shams in substance and not recognized for tax purposes. Although the parties have raised and discussed other issues, in view of the sham nature of the transactions involved, we do not reach such issues. IV. Adjustments
Respondent, having prevailed on the sham theory, must ensure that petitioners are neither charged with income from the transactions at issue nor permitted to claim the deductions and credits allegedly generated as a result of those transactions. See Sheldon v. Commissioner, 94 T.C. 738, 762 (1990). Additionally, our finding of lack of economic substance means that the long-term "indebtedness" is not genuine. See Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). Nevertheless, to the extent that the purchaser or lessees actually paid interest on the short-term notes issued *376 as payments, such interest is deductible. Rose v. Commissioner, 88 T.C. at 386, 423 (1987). Appropriate orders will be issued. Footnotes
1. Cases of the following petitioners are consolidated herewith: Audio Advertising Ltd. Partnership, Audio Creations, Inc., Tax Matters Partner, docket No. 2976-88; Assured Communications Ltd. Partnership, General Productions Inc., Tax Matters Partner, docket No. 3027-88; Advanced Communications Ltd. Partnership, Advanced Productions, Inc., Tax Matters Partner, docket No. 3028-88; Masterwork Productions Leasing Ltd. Partnership, Masterworks Leasing, Ltd., Tax Matters Partner, docket No. 3029-88; Station I.D. Ltd. Partnership, Colwill & Associates, Inc., Tax Matters Partner, docket No. 20877-89; and United Communications Ltd. Partnership, Communications Marketing Corp., Tax Matters Partner, docket No. 20878-89.↩
2. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. As a practical matter, BP had no separate existence from RABI, and both corporations were later merged into successor corporations. For the sake of convenience, we shall refer to RABI as the producer of the subject jingles and ID's, except when references to BP are necessary for clarity.↩
4. Petitioners argue that respondent raised the issues of lack of economic substance and lack of profit objective only in the FPAA's to Pacific, Station I.D., and United. On August 7, 1989, respondent filed amended answers to raise these issues with respect to the other partnerships. Petitioners now urge that, with respect to those other partnerships, these issues are new matters within the scope of Rule 142(a), thus shifting to respondent the burden of proof. We are not convinced that the amended answers raise new matters so as to require a shift in the burden of proof. See Sorin v. Commissioner, 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741↩ (2d Cir. 1959). We need not decide that issue, however, because in each of these consolidated cases, respondent has exceeded any burden so imposed. Respondent has convincingly demonstrated a lack of profit objective and economic substance by proving not only vastly inflated purchase prices for the items at issue, but also pervasive failures to investigate the jingle/ID business and other failures to follow profit-motivated business practices.
5. Petitioners have moved to exclude Finn's report, on the ground that he assumes the viewpoint of a potential investor, not that of a manager of the subject partnership. The objection is without merit. The viewpoint of a potential investor is entirely practical in evaluating economic substance. See Gilman v. Commissioner, 933 F.2d 143, 148 (2d Cir. 1991), affg. T.C. Memo. 1989-684↩. An order denying petitioners' motion will be issued.
6. Figures for the lessee partnership Pacific Sounds were not available for all of the years involved.↩